**SUMMIT MEDICAL ASSOCIATES,**
**P.C., et al., Plaintiffs,**

v.

**Fob JAMES, Jr., et al., Defendants.**

**Civil Action No. 97–T–1149–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 26, 1998.

J. Richard Cohen, Rhonda Brownstein, Southern Poverty Law Center, Montgomery, AL, Kathryn Kolbert, Julie Kay, Simon Heller, Center for Reproductive Law & Policy, New York City, David A. Gespass, Kathleen M. Johnson, Johnson & Gespass, Birmingham, AL, for Summit Medical Associates, William H. Knorr, M.D., Beacon Women's Center, New Woman, All Women Health Care.

Algert S. Agricola, Jr., Wallace, Jordan, Ratliff & Brandt, L.L.C., Montgomery, AL, Jere L. Beasley, Thomas J. Methvin, P. Leigh O'Dell, Beasley, Wilson, Allen, Main & Crow, P.C., Montgomery, AL, Charles B. Campbell, Albert L. Jordan, Kimberly R. West, Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, AL, William P. Gray, Jr., Gray & Jauregui, Montgomery, AL, for Fob James.

Algert S. Agricola, Jr., Wallace, Jordan, Ratliff & Brandt, L.L.C., Montgomery, AL, Charles B. Campbell, Albert L. Jordan, Kimberly R. West, Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, AL, for Bill Pryor, Ellen Brooks.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

The plaintiffs, Alabama-based providers of abortion services, challenge the constitutionality of two recently-enacted Alabama abortion statutes under the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983 (West 1994). The first challenged statute is the Alabama Partial-Birth Abortion Ban Act of 1997, 1975 Ala.Code § 26–23–1 to 26–23–6 (Law.Co-op.Supp.1997), which took effect on August 1, 1997, and proscribes what it terms "partial-birth abortions," except under certain medical emergency circumstances. The second statute, the Alabama Abortion of Viable Unborn Child Act, 1975 Ala.Code §§ 26–22–1 to 26–22–4 (Law.Co-op.Supp.1997), took effect on August 12, 1997, and proscribes abortions performed after the fetus has achieved "viability." The plaintiffs seek declaratory and injunctive relief and have named as defendants the Governor of the State of Alabama, the Attorney General of the State of Alabama, and the Montgomery District Attorney, in her official capacity and as a representative of the class of district attorneys for the State of Alabama. The jurisdiction of the court has been properly invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343(a)(3) (West 1994).

This lawsuit is currently before the court on a motion to dismiss filed by the governor on September 4, 1997, and on a motion to dismiss filed by the attorney general and Montgomery district attorney (collectively, "the attorney general defendants"), also on September 4, 1997. A hearing was held on the motions on November 24, 1997. For the reasons that follow, the court will deny the governor's motion in its entirety, will grant the attorney general defendants' motion in part and deny it in part, and will certify certain pertinent questions of state law to the Alabama Supreme Court.

## I. LEGAL STANDARD FOR MOTION TO DISMISS

In considering a defendant's motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, the court accepts the plaintiffs' factual allegations as true, *Jackson v. Okaloosa County*, 21 F.3d 1531, 1534 (11th Cir.1994); *Andreu v. Sapp*, 919 F.2d 637, 639 (11th Cir.1990), and construes the complaint liberally in the plaintiffs' favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The action may not be dismissed unless "it appears to a certainty," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), that the plaintiffs can offer no set of

facts supporting the relief requested. *Scheuer, supra; Duke v. Cleland,* 5 F.3d 1399, 1402 (11th Cir.1993).

## II. BACKGROUND

The facts of this case, as alleged by the plaintiffs, are as follows. The Alabama Partial–Birth Abortion Ban Act of 1997 prohibits any physician from "knowingly" performing a "partial-birth abortion." 1975 Ala.Code § 26–23–3 (Law.Co-op.Supp.1997).[1] Such an abortion is defined in the statute as "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery." § 26–23–2(3). Neither the term "partial-birth abortion," nor the foregoing definition, is generally accepted in the medical community.

The partial-birth abortion statute provides only a single exception to its ban, which applies where the abortion "is necessary to save the life of the mother." § 26–23–4. The act contains no similar exception to preserve the mental or physical health of the pregnant woman.

The partial-birth abortion statute carries criminal penalties, namely conviction of a Class C felony punishable by a fine of not more than $5,000 and imprisonment for up to ten years, and triggers the possibility of license revocation under Alabama law. § 26–23–3; *see also* 1975 Ala.Code §§ 13A–5–6 & 13A–5–11 (Michie 1994); 1975 Ala.Code § 34–24–360(4) (Michie 1991). It also creates a civil cause of action against the physician, which may be brought by the "father" of the fetus, if married to the woman who underwent the abortion, or the "maternal grandparents" of the fetus, if the woman was a minor at the time. 1975 Ala.Code § 26–23–5 (Law.Co-op.Supp.1997).

On August 1, 1997, the day upon which the partial-birth abortion statute took effect, the Alabama attorney general forwarded a letter to four Alabama district attorneys instructing them that for purposes of prosecutions brought under the act, "a physician partially delivers a *living fetus* before killing the fetus [as proscribed by the act] when the physician deliberately and intentionally delivers into the vagina a *viable fetus,* or a substantial portion of the viable fetus, for the purpose of performing a procedure the physician knows will kill the fetus, and kills the fetus." (Emphasis added.) In the letter, the attorney general stated that his instructions to the district attorneys were given pursuant to

---

1. This act reads, in its entirety, as follows:

"§ 26–23–1. Short title.
This chapter may be cited as the 'Alabama Partial–Birth Abortion Ban Act of 1997.'
"§ 26–23–2. Definitions.
As used in this chapter, the following terms shall have the following meanings:
(1) FATHER. The biological father of the human fetus.
(2) MOTHER. The female who is pregnant with a live human fetus which may be subject to a partial-birth abortion under this chapter.
(3) PARTIAL-BIRTH ABORTION. An abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery.
(4) PHYSICIAN. A doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the state or any other individual legally authorized by the state to perform abortions. This definition shall also include any individual who is not a physician or is not otherwise legally authorized by the state to perform abortions, but who nevertheless performs a partial-birth abortion

"§ 26–23–3. Felony conviction.
Any physician who knowingly performs a partial-birth abortion within this state and thereby kills a human fetus shall be guilty of a *Class C* felony and upon conviction thereof shall be punished as prescribed by law.
"§ 26–23–4. Life of mother exception.
Section 26–23–3 shall not apply to a partial-birth abortion that is necessary to save the life of a mother.
"§ 26–23–5. Civil action.
The father, if married to the mother at the time she 'receives a partial-birth abortion procedure, and if the mother has not attained the age of 18 years at the time of the abortion, the maternal grandparents of the fetus, may in a civil action obtain appropriate relief, unless the pregnancy resulted from the plaintiff's criminal conduct or the plaintiff consented to the abortion. The relief shall be limited to a monetary compensation for all injuries, psychological and physical, occasioned by a violation under this chapter and monetary punitive compensation as allowed by law.
"§ 26–23–6. Conspiracy.
A woman upon whom a partial-birth abortion is performed may not be prosecuted under this chapter for a conspiracy to violate this chapter or for any other offense which is unlawful under this chapter"

1975 Ala.Code § 36–15–14 (Michie 1991), which provides in pertinent part as ·follows: "The attorney general ... may at any time he sees proper, either before or after indictment, superintend and direct the prosecution of any criminal case in any of the courts of this state."

2. This act reads, in its entirety, as follows:

"§ 26–22–1. Legislative findings and intent.
(a) The public policy of the State of Alabama is to protect life, born and unborn. This is particularly true concerning unborn life that is capable of living outside the womb. The Legislature of the State of Alabama finds there are abortions being done in Alabama after the time of viability and in violation of its public policy.
(b) The Legislature specifically finds the following:
 (1) Medical evidence shows there is a survival rate of babies born between ages 23 weeks to 29 weeks gestational age of 64 percent to 94 percent.
 (2) In Webster v. Reproductive Health Services, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), the United States Supreme Court determined that viability may occur as early as 23 to 24 weeks gestational age. Also, the United States Supreme Court determined that requiring fetal viability testing at 20 weeks gestational age is constitutional, because there is up to a four week margin of error in determining gestational age.
 (3) In the latest year of Alabama statistical reporting, 1994, there were reported to be 182 abortions performed at 20 or more weeks gestational age. There were also 70 abortions performed where no gestational age was stated.
(c) Subject to life and health exceptions to the mother, it is the intent of the Legislature to ban abortions of any unborn child that is capable of living outside the womb. To permit otherwise is a wanton disregard of human life.
"§ 26–22–2. Definitions.
The following words shall have the following meanings:
(1) ABORTION. The use of any means to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child.
(2) FERTILIZATION. The fusion of a human spermatozoon with a human ovum.
(3) GESTATIONAL AGE. The age of the unborn child as calculated from the first day of the last menstrual period of the pregnant woman.
(4) HOSPITAL. An institution licensed pursuant to the provisions of the law of this state.
(5) LIVE BIRTH. When used with regard to a human being, means that the human being was completely expelled or extracted from his or her mother and after such separation, breathed

The second challenged act, the Alabama Abortion of Viable Unborn Child Act, prohibits any person from "intentionally, knowingly, or recklessly" performing or inducing an abortion "when the unborn child is viable." 1975 Ala.Code § 26–22–3(a) (Law.Co-op. Supp.1997).[2] However, such a post-viability'

or showed evidence of any of the following: beating of the heart, pulsation of the umbilical cord, definite movement of voluntary muscles, or any brain-wave activity.
(6) MEDICAL EMERGENCY. The condition, which, on the basis of the physician's good-faith clinical judgment, so complicates a pregnancy as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.
(7) PREGNANT. The female reproductive condition of having a developing fetus in the body and commences with fertilization.
(8) UNBORN CHILD AND FETUS. An individual organism of the species homo sapiens from fertilization until live birth.
(9) VIABLE AND VIABILITY. The stage of fetal development when, in the judgment of the physician based upon the particular facts of the case before him or her and in light of the most advanced medical technology and information available to him or her, there is a reasonable likelihood of sustained survival of the unborn child outside the body of his or her mother, with or without artificial support."
"§ 26–22–3. Prohibition, exceptions, and regulations.
(a) *Prohibition.* Except as provided in subsection (b), no person shall intentionally, knowingly, or recklessly perform or induce an abortion when the unborn child is viable.
(b) *Exceptions.*
 (1) It shall not be a violation of subsection (a) if an abortion is performed by a physician and that physician reasonably believes that it is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman. No abortion shall be deemed authorized under this paragraph if performed on the basis of a claim or a diagnosis that the woman will engage in conduct which would result in her death or in the substantial and irreversible impairment of a major bodily function of the woman.
 (2) It shall not be a violation of subsection (a) if the abortion is performed by a physician and that physician reasonably believes, after making a determination of the viability of the unborn child in compliance with Section 26–22–4 relating to the determination of viability, that the unborn child is not viable.
(c) *Abortion regulated.* Except in the case of a medical emergency which, in the reasonable medical judgment of the physician performing

abortion may be performed where a physician "reasonably believes that it is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman." § 26–22–3(b)(1). "Viable and viability" are defined in the act as follows:

"The stage of fetal development when, in the judgment of the physician based upon the particular facts of the case before him or her and in light of the most advanced medical technology and information available to him or her, there is a reasonable likelihood of sustained survival of the unborn child outside the body of his or her mother, with or without artificial support." § 26–22–2(9).

The post-viability abortion statute also imposes five additional procedural requirements upon a physician performing a post-viability abortion in the limited medical emergency circumstances under which such an abortion is permitted. § 26–22–3(b)(1) & (c)(1)-(5). These requirements are waived where the physician, in his or her reasonable medical judgment, determines that the nature of the medical emergency prevents compliance. § 26–22–3(c).

Pursuant to the post-viability abortion statute, all physicians performing abortions after the nineteenth week of pregnancy must make a good-faith medical judgment as to whether the fetus is viable. §§ 26–22–2(9) & 26–22–4. However, the plaintiffs allege, the act does not specify the point at which the pregnancy begins for purposes of determining whether the pregnancy is in its nineteenth week.

The post-viability abortion statute imposes criminal penalties against the person who intentionally, knowingly, or recklessly per-

the abortion, prevents compliance with a particular requirement of this subsection, no abortion which is authorized under subsection (b)(1) shall be performed unless each of the following conditions are met:

(1) The physician performing the abortion certifies in writing that, based upon his or her medical examination of the pregnant woman and his or her medical judgment, the abortion is necessary to prevent either the death of the pregnant woman or serious risk of substantial and irreversible impairment of a major bodily function.

(2) The physician's judgment with respect to the necessity for the abortion has been concurred in by one other licensed physician who certifies in writing that, based upon his or her separate personal medical examination of the pregnant woman and his or her medical judgment, the abortion is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman.

(3) The abortion is performed in a hospital.

(4) The physician terminates the pregnancy in a manner which provides the best opportunity for the unborn child to survive, unless the physician determines, in his or her good faith medical judgment, that termination of the pregnancy in that manner poses a significantly greater risk either of the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman than would other available methods.

(5) The physician performing the abortion arranges for the attendance, in the same room in which the abortion is to be completed, of a second physician who shall take control of the child immediately after complete extraction from the mother and shall provide immediate medical care for the child, taking all reasonable steps necessary to preserve the child's life and health.

(d) *Penalty*. Any person who violates subsection (a) commits a Class A felony. Any person who violates subsection (c) commits a Class C felony.

"§ 26–22–4. Viability testing.

Except in the case of a medical emergency, prior to performing an abortion upon a woman subsequent to her first 19 weeks of pregnancy, the physician shall determine whether, in his or her good faith medical judgment, the child is viable. When the physician has determined that a child is viable, he or she shall report the basis for his or her determination that the abortion is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman. When the physician has determined that a child is not viable after the first 19 weeks of pregnancy, he or she shall report the basis for such determination.

"§ 26–22–5. Interpretation.

Nothing in this chapter shall be construed to recognize a right to abortion or to make legal an abortion that is otherwise unlawful."

This act, as enacted, also contained the following severability provision, which was not included in the statute as codified:

"If any provision, word, phrase, or clause of this act, or the application thereof, to any person, entity, or circumstance shall be held invalid, such invalidity shall not affect the remaining provisions, words, phrases, clauses, or application of this act, which can be given effect without the invalid provision, word, phrase, clause, or application, and to this end, the provisions, words, phrases, and clauses of this act are declared to be severable."

forms or induces a post-viability abortion. §§ 26–22–3(a) & (d). Specifically, that person has committed a Class A felony, punishable by imprisonment from ten to 99 years and fines up to $20,000. § 26–22–3(d); *see also* 1975 Ala.Code §§ 13A–5–2, 13A–5–6(a)(1), & 13A–5–11(a)(1) (Michie 1994). The act also criminalizes, as a Class C felony, punishable by imprisonment from one year and one day to ten years and fines up to $5,000, the failure to comply with the procedural requirements for post-viability abortions set forth in § 26–22–3(c)(1) to (5). 1975 Ala.Code § 26–22–3(d) (Law.Co-op.Supp. 1997); *see also* 1975 Ala.Code §§ 13A–5–2, 13A–5–6(a)(3), & 13A–5–11(a)(1) (Michie 1994).

Four plaintiffs have brought this lawsuit. They all allege that they perform abortions in the state of Alabama. Plaintiff Summit Medical Associates, P.C. provides abortions through 24 weeks of pregnancy, measured from the time of the woman's last menstrual period, or "lmp"; plaintiff William Knorr, M.D., performs abortions at Summit Medical, and intends to perform such abortions through 24 weeks lmp; plaintiff New Woman, All Women Health Care provides abortions through 20 weeks lmp; and plaintiff Beacon Women's Center provides abortions through 18 weeks lmp.

All plaintiffs perform abortions through approximately 13 weeks lmp that they allege may fall within the proscription of the partial-birth abortion statute, and each intends to continue performing such abortions despite the existence of the act, in order to provide the best possible care for patients. Summit Medical and Dr. Knorr perform abortions through 24½ weeks lmp that they allege may fall within the proscription of the post-viability abortion statute, and both intend to continue performing such abortions despite the existence of the act, in order to provide the best possible care for patients. As a consequence of these intentions, all plaintiffs allege that they fear prosecution under either or both acts.

According to the latest data from Alabama, compiled in 1995, 89% of the 14,221 abortions performed in the state were performed through the first 13 weeks lmp, 9.7% were performed from 14 through 24 weeks lmp, and less than 1% were performed after week 19 lmp, with none reported to have been performed past 24 weeks lmp. It is not known at what stage 0.88% of abortions in the state were performed.

Numerous reasons underlie the decision to perform an abortion after 13 weeks lmp (that is, after the first trimester). These include health problems arising during pregnancy, diagnosis of fetal anomalies, either severe or fatal, and lack of patient resources at an earlier date.

Requiring that a woman travel out of state for an abortion procedure introduces time delays and expense that may preclude the woman from actually obtaining a desired abortion, as well as an attendant increase in risk. Additionally, any delay imposed on a woman seeking an abortion increases both the risks to her, and the costs of the procedure.

Several methods are used to effect post-first-trimester abortions. These include: suction curretage (in limited circumstances); both traditional and intact dilation and evacuation (D&E); induction methods using saline, urea, or prostaglandins; hysterotomy; and hysterectomy. The vast majority of abortions performed after 13 weeks lmp employ traditional and intact D&E, while induction methods account for a small minority of such abortions. Hysterotomy and hysterectomy are rarely employed in Alabama as abortion techniques.

The most appropriate procedure to use in a given case depends on a multitude of factors, including the woman's health, any medical contraindications, physician skill, the woman's prior surgical history and desire to preserve fertility, the need to remove the fetus intact, the assessment of alternative risks, cost factors, and location.

According to the plaintiffs' allegations, the methods most often employed in traditional and intact D&E procedures may fall within the strictures of the partial-birth abortion act, because parts of the fetus sometimes pass into the vaginal canal. Moreover, the main alternative to the D&E procedures, the induction method, also may fall within the act's proscription because the fetus may par-

**1418**

tially emerge during the procedure while still "living."

The hysterotomy and hysterectomy procedures are major surgical procedures that are more dangerous than their counterparts, and rarely medically appropriate. These techniques do not appear, according to the plaintiffs, to fall within the proscription of the partial-birth abortion statute.

## III. THE GOVERNOR'S MOTION TO DISMISS

In his motion to dismiss this lawsuit, the governor urges this court to recognize that the "United States Constitution does not address the subject of abortion" and further urges this court to comply with the oath of office taken by all federal judges to be bound to that Constitution by ignoring any Supreme Court precedents holding to the contrary.[3] According to the governor, the Supreme Court, as "a chief 'protector' of the abortion industry in America," has run roughshod over the Constitution in its abortion jurisprudence, and has, in the absence of a national consensus, "assumed the power to amend the Constitution itself" to create abortion rights that otherwise do not exist.[4] Consequently, the governor contends, for this court to abide by the Supreme Court's abortion decisions would be tantamount to an abdication of its duty to uphold "the Constitution as written and as legally amended under the authority of the 'people of the United States' alone."[5]

■ As the plaintiffs correctly observe, the governor asks this court to contravene long-established principles of Anglo–American law by urging it to disregard plainly controlling Supreme Court precedent. The Eleventh Circuit Court of Appeals underscored these fundamental principles in *Jaffree v. Wallace*, 705 F.2d 1526, 1532–33 (11th Cir.1983), *aff'd*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), when it reversed an Alabama district court that "chose to disregard Supreme Court precedent" in an establishment clause case. In a section of its opinion entitled "Precedent," the Eleventh

Circuit explained the governing principles as follows:

"Under our form of government and long established law and custom, the Supreme Court is the ultimate authority on the interpretation of our Constitution and laws; its interpretations may not be disregarded. . . . Federal district courts and circuit courts are bound to adhere to the controlling decisions of the Supreme Court. Justice Rehnquist emphasized the importance of precedent when he observed that 'unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.' [*Hutto v. Davis*, 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556.] *See also, Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983). . . . Judicial precedence serves as the foundation of our federal judicial system. Adherence to it results in stability and predictability. If the Supreme Court errs, no other court may correct it."

*Id.* at 1532–33. The court further emphasized that Supreme Court precedent is to be adhered to even where the pertinent issues are subject to political debate, stating that "While many may disagree on the subject of prayer in public schools, our Constitution provides that the Supreme Court is the final arbiter of constitutional disputes." *Id.* at 1536.

■ It cannot seriously be disputed that these bedrock principles apply with equal force to the Supreme Court's abortion jurisprudence, despite the sharp differences in public opinion that surround this politically-charged issue. For without these governing principles, embodied in the notion of the "rule of law", judges would be at liberty to pick and choose which Supreme Court decisions they wished to follow, with the result that no one would ever know what law applied to the citizenry of this country at any given time: chaos and anarchy would reign.

---

3. Governor Fob James, Jr.'s brief in support of motion to dismiss, filed September 30, 1997, at 1.

4. *Id.*

5. *Id.* at 9.

The federal judicial system can no more operate under a scheme in which lower court judges could freely pick and choose higher court precedent than the governor could govern under a scheme in which state citizens to whom he is beholden could freely pick and choose the laws with which they would comply. It may be that Supreme Court abortion jurisprudence is "wrong," but the avenue for redress is to convince the Supreme Court itself to change its precedent or, failing that, to convince the people of the Country to amend the Constitution.

This court, therefore, will adhere to the controlling Supreme Court decisions pertaining to the regulation and proscription of abortions. Notwithstanding any allegations by the governor or the other defendants that these decisions are based on faulty premises or are otherwise infirm, this court refuses to disregard binding Supreme Court precedent, for it is that Court's prerogative alone to overrule one of its own precedents. *See State Oil Co. v. Khan,* —— U.S. ——, ——, 118 S.Ct. 275, 284, 139 L.Ed.2d 199 (1997). Accordingly, the court will deny the governor's motion to dismiss.

## IV. ATTORNEY GENERAL DEFENDANTS' JURISDICTIONAL CHALLENGES

In addition to arguing that the plaintiffs have failed to state any claim in their complaint upon which relief may be granted, the attorney general defendants have raised a number of challenges to this court's authority to exercise jurisdiction over the plaintiffs' claims. It is to these challenges, which implicate numerous complex questions of federal jurisdiction, that the court must first devote its attention.

Careful parsing of the briefs filed by the attorney general defendants reveals that they attempt to erect three distinct sets of jurisdictional hurdles to the bringing of this lawsuit in federal district court: first, that the plaintiffs' claims are barred by the eleventh amendment of the United States Constitution, which immunizes all of the named defendants from suit; second, that the court must abstain from hearing the plaintiffs' claims in view of various principles of comity and equity; and, third, that none of the plaintiffs' claims is justiciable because none

satisfies the case-or-controversy requirements imposed by Article III of the United States Constitution. Unfortunately, but understandably, given the complexity of the issues involved and the opacity of the pertinent case law, the attorney general defendants in their briefs conflate, rather than treat as analytically distinct, the myriad issues raised by their various jurisdictional challenges. The plaintiffs, too, fail to address all of these issues in an organized fashion.

For the sake of clarity, and to ensure that it fully and properly resolves each of the attorney general defendants' challenges, the court will address them separately and systematically. First, it will determine whether, as the attorney general defendants contend, all of the plaintiffs' claims are barred by the eleventh amendment, so that the entire lawsuit must be dismissed. Next, the court will ascertain whether the suit as a whole, or any subset of the plaintiffs' claims, must be dismissed for lack of an Article III case or controversy. To resolve this issue, the court will address whether the plaintiffs enjoy standing to bring their various claims, as well as whether any of these claims has been rendered moot, and hence non-justiciable, in light of the defendants' post-filing actions. Finally, the court will determine whether any of the abstention doctrines, grounded on considerations of comity between the state and federal judicial systems, and on principles that govern federal courts sitting in equity, counsels dismissal of any of the plaintiffs' claims, or a stay pending resolution by the Alabama Supreme Court of any issues raised by these claims. As explained more fully below, with respect to the majority of the plaintiffs' claims for declaratory relief, the court rejects all of the foregoing arguments proffered by the attorney general defendants, and will proceed to address whether the plaintiffs' complaint should be dismissed for failure to state a claim upon which relief may be granted. However, the court will dismiss all claims for injunctive relief, because the plaintiffs have not satisfied the heavy burden required to establish a right to such relief under pertinent Supreme Court jurisprudence. Additionally, the court will certify, to the Alabama Supreme Court,

questions of statutory construction pertinent to some of the plaintiffs' claims.

### A. Eleventh Amendment Immunity

■ The attorney general defendants base their first challenge to the plaintiffs' right to bring this lawsuit on the eleventh amendment of the United States Constitution, which provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Eleventh amendment sovereign immunity has been held to apply to suits brought by citizens against their own state, and is likewise applicable to cases in which the court's jurisdiction is grounded on the existence of a federal question. *See Seminole Tribe v. Florida,* 517 U.S. 44, 68–74, 116 S.Ct. 1114, 1130–32, 134 L.Ed.2d 252 (1996). Here, it is undisputed that citizens of Alabama have sued Alabama state officials pursuant to the fourteenth amendment of the United States Constitution, and that the state has not waived its eleventh amendment sovereign immunity and thereby consented to suit. Consequently, as the parties recognize, the lawsuit must be dismissed, unless it falls within a longstanding—and still vital—exception to eleventh amendment immunity, first articulated by the Supreme Court in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), for actions seeking declaratory and injunctive relief against state officials for alleged violations of federal law. The Court has explained this exception, commonly referred to as the *Ex parte Young* doctrine, as follows: "The theory of *Young* was that an unconstitutional statute is void, and therefore does not 'impart to [the official] any immunity from responsibility to the supreme authority of the United States.' *Young* also held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law. We have refused to extend the reasoning of *Young,* however, to claims for retrospective relief." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) (internal citations omitted). The Supreme Court has characterized the "authority-stripping" theory of *Ex parte Young* as a "fiction," because it creates an imaginary distinction between the state and its officers, deeming that the officers act without the state's authority when enforcing state laws in derogation of the Constitution. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 114 n. 25, 104 S.Ct. 900, 915 n. 25, 79 L.Ed.2d 67 (1984).

The parties are correct to observe that no defendant in the handful of challenges to partial-birth abortion statutes initiated in other federal district courts has attempted to evade suit on the basis of eleventh amendment immunity, and thus this issue is one of first impression in the partial-birth abortion arena. Moreover, the court is aware of only three decisions addressing general abortion statutes in which such a defense was raised. *See Jane L. v. Bangerter,* 794 F.Supp. 1528, 1530–31 (D.Utah 1992) (finding that the State of Utah had expressly and voluntarily waived its eleventh amendment immunity in a challenge to an abortion statute); *Guam Society of Obstetricians and Gynecologists v. Ada,* 776 F.Supp. 1422, (D.Guam 1990) (holding that the eleventh amendment did not bar injunctive relief against enforcement of an abortion statute by the governor and attorney general of Guam), *aff'd,* 962 F.2d 1366 (9th Cir.1992); *Akron Center for Reproductive Health v. Rosen,* 633 F.Supp. 1123, 1128–30 (N.D.Ohio 1986) (holding that the state governor and attorney general were not proper parties in a constitutional challenge to an abortion statute, because enforcement of the challenged statute was clearly delegated to the prosecuting attorneys of the state, two of whom were found to be proper defendants in the action), *aff'd sub nom., Akron Center for Reproductive Health v. Slaby,* 854 F.2d 852 (6th Cir.1988), *rev'd on other grounds sub nom., Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990).

Not surprisingly, the parties vigorously contest whether the *Ex parte Young* doctrine applies to this suit. The attorney general defendants, predictably, assert that the plaintiffs' broad claims for relief may not be squeezed and contorted to fit within the extremely narrow confines carved out for the doctrine by applicable Supreme Court juris-

prudence. The plaintiffs, by contrast, assert that the attorney general defendants, by misconstruing the pertinent case law, seek unduly to constrain the *Ex parte Young* doctrine in clear contravention of long-settled Supreme Court precedent.

■ The dispute surrounding this question, once stripped of all irrelevant rhetoric pertaining to the distinct issues of justiciability and abstention, which will be taken up below, may be distilled to two primary issues. First, the attorney general defendants argue, and the plaintiffs vigorously contest, that although the plaintiffs seek relief that is purely prospective, and so arguably falls within the purview of the *Ex parte Young* doctrine, the specific relief sought is sufficiently intrusive and connected to the state itself that the "fiction" worked by that doctrine should play no role here. The second primary argument proffered by the attorney general defendants in support of their eleventh amendment immunity claim is grounded on the *Ex parte Young* doctrine's requirement that the challenged conduct of the state officials be "ongoing" or "continuing," and not merely "threatened," for the exception to apply. The attorney general defendants contend that the plaintiffs face, at most, a speculative threat of prosecution under the statutes, and that consequently their claims do not qualify for the *Ex parte Young* exception. As explained more fully below, the court rejects both of these arguments, and holds that the plaintiffs' claims for declaratory and injunctive relief against the Alabama state officials fall squarely within the *Ex parte Young* doctrine as currently interpreted and applied by the Supreme Court.

In support of the their first argument regarding eleventh amendment immunity, the attorney general defendants rely primarily on the Supreme Court's recent decision in *Idaho v. Coeur d'Alene Tribe of Idaho*, ⸻ U.S. ⸻, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). In that case, the Court was confronted with the question of whether an eleventh amendment bar prevented a federal district court from adjudicating the Coeur d'Alene tribe's claims for declaratory and injunctive relief against the State of Idaho concerning the submerged lands and bed of Lake Coeur d'Alene, as well as various associated elements of the lake's water sys-

tem. ⸻ U.S. at ⸻, 117 S.Ct. at 2040. The relief sought by the tribe, characterized by the Court as "far-reaching and invasive," included declaratory relief to establish its entitlement to occupy and use the submerged lands, and injunctive relief to prohibit the state from regulating, or permitting or taking any action in violation of, the Tribe's exclusive rights of use and occupancy, quiet enjoyment and other ownership interest in the submerged lands. *Id.*, ⸻ U.S. at ⸻, ⸻, 117 S.Ct. at 2032, 2040.

The majority, while recognizing that "An allegation of an on-going violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction," refused to apply the exception under the "particular and specific circumstances" of the case. *Id.* at ⸻, ⸻, 117 S.Ct. at 2040, 2043. In reaching its decision, the Court emphasized that the extensive relief sought by the tribe, at least in functional terms, was tantamount to a quiet title suit, which all agreed would be barred by the eleventh amendment absent waiver by the state. The Court explained:

> "It is common ground between the parties, at this stage of the litigation, that the Tribe could not maintain a quiet title suit against Idaho in federal court, absent the State's consent. The Eleventh Amendment would bar it. Despite this prohibition, the declaratory and injunctive relief the Tribe seeks is close to the functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the State to the Tribe."

*Id.* at ⸻, 117 S.Ct. at 2040. Thus, the Court was plainly concerned that permitting the tribe to pursue the suit in federal court would constitute an impermissible affront to the state's sovereignty, and that such concerns must be given weight even where the plaintiffs' claims formally are limited to declaratory and injunctive relief.

■ Despite the attorney general defendants' efforts to characterize the instant case as one raising such a conflict between the plaintiffs' claims for extensive relief and fundamental elements of state sovereignty, the court concludes that the holding in *Coeur d'Alene* is inapplicable to the facts presented

here. The plaintiffs' desired relief, though it effectively would wipe two recently-enacted state statutes off the books, cannot be said to be as far-reaching or intrusive as that sought in *Coeur d'Alene;* here, unlike in *Coeur d'Alene,* the state's sovereign interest in exercising its authority over the challenged arena (certain forms of abortion) would not be so fundamentally diminished or eliminated because the state would be free to enact new, appropriate legislation if the relief sought were to be granted. By contrast, were the tribe in *Coeur d'Alene* to prevail on its claims in federal court, Idaho would have irretrievably lost, for all time, practically its entire power to regulate the disputed submerged lands. On this point, the Supreme Court was emphatic:

> "The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State. The requested injunctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters. The suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory. To pass this off as a judgment causing little or no offense to Idaho's sovereign authority and its standing in the Union would be to ignore the realities of the relief the Tribe demands."

—— U.S. at ——, 117 S.Ct. at 2040. Simply stated, the plaintiffs here, unlike the Coeur d'Alene tribe, do not seek relief that is tantamount to relief that they are barred from obtaining from the state absent waiver of eleventh amendment immunity.

The foregoing conclusion is not undermined by the holdings in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), where the Supreme Court refused to apply the *Ex parte Young* doctrine despite the absence in the complaints in question of any claims for retroactive or monetary relief. Those cases, like *Coeur d'Alene,* presented the Court with circumstances in which the plaintiffs' claims, although couched in terms of injunctive or declaratory relief, would have had an effect on the states akin to a request for monetary damages or restitution. *See Green,* 474 U.S. at 73, 106 S.Ct. at 428 (holding that the eleventh amendment barred a claim for declaratory relief because issuance of such a judgment would have had "much the same effect as a full-fledged award of damages or restitution by the federal court"); *Edelman,* 415 U.S. at 665–66, 94 S.Ct. at 1356–57 (holding that relief labeled "equitable" in nature may fall outside the *Ex parte Young* doctrine, and hence be barred by the eleventh amendment, where the funds to satisfy the award must inevitably come from the state's general revenues).

It is difficult to imagine how the equitable relief sought by the plaintiffs in this action could have even a slight impact on Alabama's coffers, for the plaintiffs request neither compensatory damages nor retrospective relief of any type. Rather, in terms of the nature of the relief sought by the plaintiffs, this case conforms to the prototypical one in which the *Ex parte Young* exception applies, where state officials are sued in their official capacities for prospective relief calculated to prohibit them from enforcing an allegedly unconstitutional state law.

The second issue that the court must address in relation to the attorney general defendants' eleventh amendment immunity argument concerns the assertion that the *Ex parte Young* exception is inapplicable here because the plaintiffs have failed to allege that the defendants are engaged in the requisite 'ongoing or continuing' violation of the Constitution or of federal law. According to the attorney general defendants, because the plaintiffs assert, at most, an extremely remote threat that prosecutions would be brought under the two challenged acts, they cannot possibly have alleged a constitutional violation that is 'ongoing or continuing' in nature.

The defendants correctly observe that the Supreme Court has employed the terms 'ongoing' and 'continuing' to describe constitutional and federal law violations that trigger the *Ex parte Young* exception. *See, e.g., Coeur d'Alene,* —— U.S. at ——, 117 S.Ct. at 2043 ("Where a plaintiff seeks prospective relief to end a state officer's ongoing violation of federal law, such a claim can ordinarily

proceed in federal court."); *Green,* 474 U.S. at 67–68, 106 S.Ct. at 425–426 ("[T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.").

■ Importantly, however, the attorney general defendants misconstrue the Supreme Court's use of those terms when they assert that the plaintiffs cannot satisfy the "ongoing or continuing" violation requirement because the challenged statutes are so freshly minted, and because no citizen has yet been targeted for prosecution. Specifically, the attorney general defendants fail to recognize that *Ex parte Young* itself addressed, and the doctrine it spawned applies to, situations in which prosecutions under a disputed state law are merely threatened, rather than underway or complete. *See, e.g., Ex parte Young,* 209 U.S. at 159–60, 28 S.Ct. at 454 (in *pre enforcement* challenge brought against state railroad ratesetting scheme, Court holds that "If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in this person to the consequences of his individual conduct, the state has no power to impart to him any immunity from responsibility to the supreme authority of the United States."); *Steffel v. Thompson,* 415 U.S. 452, 464, 94 S.Ct. 1209, 1218, 39 L.Ed.2d 505 (1974) (characterizing *Ex parte Young* as "holding that state officials who *threaten to enforce* an unconstitutional state statute may be enjoined by a federal court of equity") (emphasis added). In fact, the Supreme Court, in *Papasan v. Allain,* 478 U.S. 265, 277–78, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986), explained that in this context the term "ongoing" is used in contradistinction to "cases in which federal law has been violated *at one time* or *over a period of time in the*

*past."* (Emphasis added). In the latter situation, of course, compensatory relief would be implicated, and so recourse to *Ex parte Young* would be unavailing. *See id.*

For a violation of federal rights to be considered "ongoing," then, does not require that a prosecution under the challenged state statute be in progress, but rather that the alleged violation of federal rights not have taken place only in the past, such that only retrospective relief may be obtained. Here, the plaintiffs contend that they face a continuing threat of prosecution and civil liability under the two disputed acts, and that as a consequence they are unable to freely exercise their asserted constitutional rights without fear of arrest, prosecution or being haled into court pursuant to the acts' civil provisions. Moreover, both the governor and the attorney general have indicated that they intend to prosecute violators under the two abortion statutes. Accordingly, the court rejects the attorney general defendants' contention that application of the *Ex parte Young* doctrine is inappropriate on these facts because there are no "ongoing" prosecutions pending or contemplated against the plaintiffs.

It bears noting that in proffering these arguments regarding the absence of a pending prosecution the attorney general defendants conflate the considerations underlying the eleventh amendment immunity issue with those raised by both their Article III challenge to the justiciability of the plaintiffs' claims and their contention that the court should abstain from hearing this lawsuit under principles of equity and comity.[6] The court does recognize, of course, that the absence of a legitimate threat of prosecution under the challenged acts would derail the plaintiffs' suit on grounds of lack of an Article III case or controversy. However, the court will not address these issues in the context of determining whether the eleventh amendment imposes a bar to this action, for they enjoy no relevance here. Rather, the court will reserve consideration of these is-

6. For instance, the attorney general defendants support their claim of eleventh amendment immunity by invoking the standards employed by courts to determine whether an Article III case or controversy has been raised, as well as those

considered by federal courts in deciding whether to abstain from hearing a lawsuit so that the state's courts may first interpret an unclear state statute.

**1424**

sues until after the eleventh amendment question has been resolved, when it turns to questions of justiciability. In so doing, the court endeavors to avoid contributing to the general confusion and inconsistent reasoning that plagues much of the existing jurisprudence in this complex area of federal jurisdictional law.

■ The attorney general defendants also devote substantial space in their briefs to an argument that the Alabama state courts offer an adequate forum for the plaintiffs to vindicate their asserted fourteenth amendment rights, and so the *Ex parte Young* doctrine should not be applied to ensure a federal forum. This argument is inapt, however, because the attorney general defendants apparently proffer it on the mistaken assumption that this court's determination of the eleventh amendment immunity issue is governed by the case-by-case, balancing of state and federal interests approach espoused by Justice Kennedy in Parts II–B, II–C, and II–D of the principal opinion in *Coeur d'Alene.* An integral part of Justice Kennedy's approach, upon which the attorney general defendants place heavy reliance, is that courts should inquire into whether there are "special factors counselling hesitation" in exercising jurisdiction over claims against state officials in federal court. See *Coeur d'Alene,* U.S. at ——, 117 S.Ct. at 2039 (quoting *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 396, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971)). However, as the attorney general defendants themselves acknowledge, Justice Kennedy's approach in Parts II–B, II–C, and II–D of the principal opinion, including his injection of the *Bivens*-based inquiry into the *Ex parte Young* context, was shared by only one other member of the Court, Chief Justice Rehnquist; it was not only not adopted by a majority of the Justices, it was subject to express criticism by the seven remaining Justices. *See Coeur d'Alene,* U.S. at ——, 117 S.Ct. at 2047 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring) ("the principal opinion replaces a straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective with a vague balancing test that purports to account for a 'broad'

range of unspecified factors"); —— U.S. at —— n. 6, —— ——, 117 S.Ct. at 2051 n. 6, 2055–58 (Souter, J., joined by Stevens, Ginsburg and Breyer, JJ., dissenting) (rejecting the principal opinion's balancing approach and its consideration of the adequacy of available state remedies in determining whether the *Ex parte Young* doctrine may be invoked). Thus, the attorney general defendants' assertions regarding the adequacy of the forum provided by the Alabama state courts for the adjudication of the constitutional issues raised by the plaintiffs' claims play no role in the court's analysis of the eleventh amendment immunity question. As Justice O'Connor stated in *Coeur d'Alene*: *Ex parte Young* is "applied '[e]ven if there is a prompt and effective remedy in a state forum. When a plaintiff seeks prospective relief to end an ongoing violation of federal rights, ordinarily the Eleventh Amendment poses no bar.' " *Id.,* —— U.S. at ——, 117 S.Ct. at 2045 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring) (citations omitted). This action, therefore, falls squarely within the well-established boundaries of the *Ex parte Young* doctrine, and the court is not persuaded otherwise by the fact that Alabama state courts stand ready and able to hear the plaintiffs' claims.

Moreover, to the extent that the attorney general defendants take the position that the plaintiffs must await a state criminal prosecution to secure their desired relief, their argument flies in the face of one of the central rationales underlying the *Ex parte Young* decision. In that case, the Supreme Court emphasized that those challenging the state criminal laws at issue faced heavy sanctions, including fines and imprisonment, if they opted to pursue their claims by disobeying the disputed laws and inviting state criminal prosecutions. The court reasoned: "It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights." 209 U.S. at 147, 28 S.Ct. at 448.

■ In the case at bar, the plaintiffs also face significant criminal sanctions for violation of the two challenged acts. Thus, no matter how faithfully the Alabama state courts would apply Supreme Court abortion jurisprudence in resolving an attack on the disputed statutes during a criminal proceeding, the court is not dissuaded from applying the *Ex parte Young* doctrine here. A state court criminal prosecution, with its attendant risk of heavy sanctions, simply is not an adequate forum for the vindication of the plaintiffs' constitutional rights.

For the foregoing reasons, the court rejects the attorney general defendants' contention that the plaintiffs' claims against them and the governor are precluded by the eleventh amendment to the United States Constitution.

### B. Article III Case–or–Controversy Requirement

■ Because the court has concluded that the eleventh amendment does not bar this lawsuit from federal court, it must next address whether it may exercise jurisdiction over the plaintiffs' claims in view of a second constitutional barrier, the case-or-controversy requirement imposed by Article III. "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.' The constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity 'to adjudge the legal rights of litigants in actual controversies.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982) (quoting *Liverpool, N.Y. & P.S.S. Co. v. Emigration Com'rs,* 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885)) (citations omitted). "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986).

The attorney general defendants contend that this threshold requirement has not been satisfied here, on two grounds. First, they argue that the plaintiffs do not enjoy standing to bring their claims for declaratory and injunctive relief in federal court. Second, they contend that any case or controversy between the parties has been rendered moot as a result of the attorney general's directive to four district attorneys that they refrain from pursuing prosecutions under the partial birth abortion statute except under limited circumstances. The court will take up these two arguments in turn below.

#### i. Standing

■ A party must have standing to bring a lawsuit, for without it a federal court may not exercise jurisdiction to decide the underlying case. See *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1375 (11th Cir.1997) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."). Standing encompasses both "constitutional requirements" imposed by Article III, and "prudential considerations." *Valley Forge,* 454 U.S. at 471, 102 S.Ct. at 757; *see Brooks,* 116 F.3d at 1375. To satisfy the constitutional mandates, a plaintiff must establish that: (1) she personally has suffered some actual or threatened injury as a result of the allegedly illegal conduct; (2) the injury fairly can be traced to the challenged action; and (3) the injury is likely to be redressed by a favorable decision by the federal court. *See Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

■ The prudential considerations governing the standing determination, on the other hand, include: (1) the principle that federal courts should avoid deciding generalized grievances presenting abstract questions of wide public significance; (2) the requirement that the plaintiff's claims fall within the zone of interests protected by the statute or constitutional guarantee at issue; and (3) the requirement that a plaintiff assert her own legal rights and interest, rather than the rights of third parties. *See Church v. City of Huntsville,* 30 F.3d 1332, 1335–36 (11th Cir. 1994).

The attorney general defendants proffer three primary arguments in support of their contention that the plaintiffs lack standing to bring this lawsuit in federal district court. First, with respect to both challenged statutes, the attorney general defendants argue that none of the plaintiffs has satisfied the

first constitutional standing requirement recited above because none is able to establish the existence of any actual or threatened injury. Second, regarding the post-viability abortion statute, the attorney general defendants assert that none of the plaintiffs enjoys standing to bring this lawsuit because none engages in the specific conduct proscribed by the act. Finally, regarding the partial-birth abortion ban act, the attorney general defendants contend that none of the abortion clinic plaintiffs has standing because application of that act is explicitly limited to "physicians" or "any other individuals," and does not encompass entities such as hospitals or clinics.

 Resolution of the issues raised by the first attack on the plaintiffs' standing, that they have established no actual or threatened injury, is governed by Supreme Court decisions that have addressed other challenges to the constitutionality of state criminal statutes. In one such decision, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), the Supreme Court explained that "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." However, the Supreme Court emphasized that a legitimate *threat* of injury is sufficient to navigate the shoals of standing: "But 'one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Id.* (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)). Nor does one who asserts that a criminal statute deters the exercise of her constitutional rights need first expose herself to actual arrest or prosecution before proceeding with her claim in federal court. *Id.*, 442 U.S. at 298, 99 S.Ct. at 2309. *See also Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (physicians challenging constitutionality of abortion statutes have standing "despite the fact that the record does not disclose that any of them has been prosecuted, or threatened with prosecution.... They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") Accordingly, the Court held in *Babbitt* that the standing re-

quirement may be satisfied "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." 442 U.S. at 298, 99 S.Ct. at 2309.

The record before the court establishes that the plaintiffs have indeed alleged their intention to continue to conduct abortion operations, which the Supreme Court arguably has sheathed in a constitutionally-protected mantle, and which the plaintiffs assert to be proscribed by the two challenged statutes. Thus, the question before the court is whether the plaintiffs have succeeded in alleging that they do in fact face a "credible threat of prosecution" under the two abortion statutes at issue here.

 A credible threat, of course, must be more than merely imaginary or speculative, *see Babbitt*, 442 U.S. at 298, 99 S.Ct. at 2309, but must be both "real and immediate, not conjectural or hypothetical." *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). It is also important to note that the court looks to the plaintiffs' allegations in determining the standing issue, for while it is true that the plaintiffs must demonstrate an immediate threatened injury as a prerequisite to obtaining preliminary injunctive relief, they need only *allege* such injury to establish their standing. *See Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980).

 Applying the foregoing principles to the facts presented here, the court has no difficulty concluding that the plaintiffs have indeed made sufficient allegations of a credible threat of prosecution to establish their standing to bring this lawsuit. As was the case in *Bolton*, the plaintiffs here challenge vital statutes of recent vintage, and there is nothing in the record to suggest that the state authorities will refrain from bringing prosecutions under them to the full extent permitted by the statutes' provisions. Although, as discussed more fully below, the Alabama attorney general has instructed four district attorneys to pursue prosecutions under the partial-birth abortion enactment

only under particular circumstances, the court is unaware of any evidence to suggest that the plaintiffs do not risk prosecution under either challenged act for performing certain of their abortion procedures, especially in view of the plaintiffs' allegations concerning the vagueness of, and broad net cast by, the statutes. Simply stated, the two challenged abortion acts are vital enactments that the state shows no indication of ignoring, and that, if the plaintiffs' allegations are accepted as true, specifically target procedures that the plaintiffs provide to their patients on an ongoing basis. Thus, the court concludes that the plaintiffs have indeed alleged that they face a sufficiently credible threat of enforcement to establish their standing to sue.

The attorney general defendants dispute that the alleged threat to the plaintiffs is sufficiently direct and immediate to imbue them with standing, citing *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), and a Fourth Circuit decision, *Doe v. Duling*, 782 F.2d 1202, 1208 (1986), to argue that the plaintiffs must show more to establish standing than the fact that state officials "stand ready to perform their general duty to enforce laws." Examination of the factual contexts presented in *Ullman* and *Duling*, however, reveals that these cases are a far cry from the instant dispute with respect to the immediacy of the threat that the plaintiffs allegedly face.

For instance, in *Ullman*, the plaintiffs sought to challenge in federal district court a Connecticut statute enacted in 1879 that purported to prohibit the rendering of medical advice on the use of contraceptives. That hoary statute had never, with a single possible exception, been used to prosecute any physicians. Similarly, the Virginia statutes ·under attack in *Duling*, which proscribed "fornication and cohabitation," had never been used as a basis for arrests or prosecution, except in the limited contexts of prostitution or non-private behavior, which were

not at issue in the suit. The unmarried plaintiffs in *Duling*, claiming to be fearful of prosecution under the statutes for cohabitating or engaging in sexual intercourse, sought declaratory and injunctive relief. In both cases, the courts refused to hold that the plaintiffs had established standing, because of the remoteness of the possibility that they would ever be prosecuted under the challenged statutes.

*Ullman* and *Duling* may best be characterized as unusual cases in which the plaintiffs sought to wipe disfavored, and allegedly anachronistic, laws off the books. In fact, the Supreme Court in *Bolton* distinguished the live abortion statute at issue in that case from the statute challenged in *Ullman*, tersely observing that the former was "recent and not moribund." *Bolton*, 410 U.S. at 188, 93 S.Ct. at 746. Likewise, this court notes that the two acts at issue in the instant dispute are far from moribund,[7] and the plaintiffs' objective is not merely to expunge allegedly obsolete laws from the state's books. Rather, the plaintiffs here challenge newly-minted laws bearing directly on their professional activities and the source of their livelihood. As a result, the holdings in *Ullman* and *Duling* have little to say in the present context.

Nor do the Supreme Court decisions in *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), *O'Shea v. Littleton, supra*, or *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), resuscitate the defendants' argument. In each of these cases, the Court's holding that the plaintiffs lacked standing stemmed primarily from the fact that future unconstitutional injury to the plaintiffs was far too conjectural, being subject to contingencies that were, at best, only remotely possible, to be sufficiently real and immediate. For instance, in *Golden*, the plaintiff sought a declaratory judgment invalidating a statute that prohibited the distribution of anonymous

---

7. The attorney general defendants do, in effect, argue that the partial-birth abortion ban act is moribund when they assert that no prosecutions for pre-viability abortions will be brought under the act as a consequence of the attorney general's letter to the district attorneys. However, this contention properly is addressed under the moot-ness element of the Article III case or controversy requirement, and the court will address it as such below, where it finds, to paraphrase Mark Twain, that the attorney general defendants' reports of the statute's demise are greatly exaggerated.

handbills pertaining to election campaigns. Under the particular circumstances of the case, the only possible threatened prosecution would have revolved around the plaintiffs' distribution of handbills concerning a single congressional candidate, who had been appointed to the Supreme Court of New York for a 14–year term, and hence would be unlikely to run for Congress again. The Court held that, given this scenario, it was "wholly conjectural" that any future prosecutions would be advanced against the plaintiff, and that, as a consequence, he did not have standing to sue for declaratory relief. Similarly, in both *Lyons* and *O'Shea*, any future recurrences of the putative threatened injury against the plaintiffs hinged upon two speculative events: first, that the plaintiffs would proceed to violate an unchallenged criminal law; and, second, that, in the course of the defendants' response to that violation (in *Lyons*, the defendant city's police officers' use of control holds during arrest; and in *O'Shea*, the defendant county magistrate and circuit court judge's setting of bond, sentencing and jury fee-setting), they would subject the plaintiffs to the allegedly unconstitutional practices. No such remote and unlikely contingencies exist here, where the plaintiffs allege that they, by pursuing the very activities upon which their careers or businesses are based, will act in a manner that subjects them to prosecution under the allegedly unconstitutional statutes. Unlike the plaintiff in *Lyons*, the plaintiffs here need not base the threat of a potential justiciable injury on "incredible assertion[s]" regarding the conduct of third parties. 461 U.S. at 105–06, 103 S.Ct. at 1667.

Having found that the plaintiffs have alleged a sufficiently credible threat of injury to confer standing upon them, the court must next address the other, more straightforward challenges to the plaintiffs' standing raised by the attorney general defendants. As stated, the attorney general defendants assert that, with respect to the post-viability abortion statute, none of the plaintiffs can satisfy the case-or-controversy requirement because they do not perform the proscribed types of abortion procedures. In support of this argument, the attorney general defendants place great emphasis on the Sixth Circuit's decision in *Akron Ctr. for Reproductive Health, Inc. v. City of Akron*, 651 F.2d 1198 (6th Cir.1981), *rev'd in part on other grounds*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), which concerned a statute, like the post-viability abortion statute at issue here, that proscribed abortions after "viability," except where necessary to prevent impairment of the pregnant woman's health or her death. The *Akron* ordinance, however, unlike the statute addressed here, established a presumption of viability at 24 weeks after lmp (that is, the start of the third trimester of pregnancy) *Akron Ctr. for Reproductive Health, Inc. v. City of Akron*, 479 F.Supp. 1172, 1185 (N.D.Ohio 1979). The Sixth Circuit affirmed the district court's holding that physician-plaintiffs who were not performing abortions beyond the first trimester (which ends at approximately 12 weeks after lmp), and who expressed no intention to perform such abortions, lacked standing in their own right to challenge the ordinance at issue. *Akron*, 651 F.2d at 1210–11. Moreover, the court rejected the plaintiffs' argument that they enjoyed third-party standing on behalf of those patients they counseled regarding post-first trimester abortions, again because they entertained no intent to themselves perform the abortions. *Id.*

Plainly, the *Akron* court's holding was a consequence of the undisputed fact that abortions carried out before the end of the first trimester, which constituted the limit beyond which the *Akron* plaintiffs did not perform abortions, take place well before the presumptive point (the start of the third trimester) at which the city ordinance proscribed abortion procedures. Here, by contrast, Alabama's post-viability abortion statute, while prohibiting all abortions performed after the fetus has reached "viability," does not explicitly define that critical juncture in terms of a point in time, nor does it set forth a presumption regarding when viability commences. Rather, the act defines "viable and viability" broadly as follows:

"The stage of fetal development when, in the judgment of the physician based upon the particular facts of the case before him or her and in light of the most advanced medical technology and information available to him or her, there is a reasonable

likelihood of sustained survival of the unborn child outside the body of his or her mother, with or without artificial support." 1975 Ala.Code § 26–22–2(9) (Law.Co-op. Supp.1997). Additionally, Alabama's post-viability abortion statute, unlike the *Akron* ordinance, prescribes viability testing prior to abortions that are performed after 19 weeks of pregnancy. § 26–22–4.

■ As the attorney general defendants concede, plaintiffs Summit Medical and Dr. Knorr have alleged that they perform abortions as late as 24 weeks lmp. Thus, they would be required under the act to comply with the viability-testing strictures prior to performing certain abortions, and would be forbidden to pursue abortions where the tests indicated fetal viability.[8] Thus, these plaintiffs are unquestionably subject to the express language of the act, and therefore have standing to challenge it.

Moreover, on the record before it the court cannot conclude that the late-second-trimester abortions performed by all plaintiffs would fall outside the act's definition of post-viability abortions.[9] The plaintiffs aver that the act's definition of viability is so broad that it could be interpreted to encompass these late-term abortions. Unlike the ordinance considered by the court in *Akron*, Alabama's post-viability abortion statute does not employ a presumptive date for the existence of a viable fetus, and so the court is unable to conclude definitively that abortions performed by any of the plaintiffs fall outside

of the range of abortions proscribed by the act. Thus, the court finds that all plaintiffs have presented allegations sufficient to establish that they could be subject to the criminal sanctions imposed by the post-viability abortion statute for certain abortions that they perform.[10]

■ In their final standing volley, the attorney general defendants contend that none of the medical clinic plaintiffs has standing to challenge the partial-birth abortion statute because the statute, by its express terms, imposes criminal or civil liability only upon "physicians" or "any other individuals," and does not encompass such entities as hospitals or clinics. The court does not need to reach the merits of this argument, however, because it is not disputed that one of the named plaintiffs, Dr. Knorr, is indeed a "physician" who risks criminal and civil liability for performing abortion operations proscribed by the partial-birth abortion statute. Because Dr. Knorr has standing to pursue the full extent of the plaintiffs' claims directed to that act, the court may exercise jurisdiction over these claims, and need not ascertain whether the other plaintiffs also have standing. *See Carey v. Population Services, Intern.,* 431 U.S. 678, 682, 97 S.Ct. 2010, 2014, 52 L.Ed.2d 675 (1977) (determination that at least one plaintiff has standing to challenge all aspects of asserted claims obviates need to determine standing of other plaintiffs); *see also Planned Parenthood*

---

**8.** The attorney general defendants urge the court to conclude that these plaintiffs do not in fact perform the proscribed post-viability abortions, because the plaintiffs themselves define viability as commencing at approximately 24 to 28 weeks lmp. The court declines this invitation. How the plaintiffs define viability in their pleadings is immaterial; rather, in deciding this motion to dismiss, the court must examine the act and determine whether it could reasonably be construed to encompass the conduct engaged in by the plaintiffs, irrespective of how the parties interpret the relevant provisions.

**9.** According to the plaintiffs' pleadings, plaintiff Beacon Women's Center provides abortions up to 18 weeks lmp, and plaintiff New Women, All Women Health Care provides abortions through 20 weeks lmp.

**10.** The attorney general defendants also complain that defendant Ellen Brooks, the Montgomery County district attorney, is not a proper party

to this lawsuit because the only plaintiff abortion provider located within Montgomery County, Beacon Women's Center, does not perform the procedures proscribed by either statute. However, for the reasons provided above, the court has concluded that Beacon Women's Center does have standing to sue here in view of the plaintiffs' allegations that the statutes' broad definitions of the proscribed procedures could encompass abortions performed by Beacon Women's Center and the other plaintiff abortion providers. Thus, the court rejects the attorney general defendants' contention, at the motion-to-dismiss stage, that Brooks is not a proper party to this lawsuit. If, at a later juncture in this lawsuit, the attorney general defendants can proffer facts establishing that Brooks should be dismissed from this suit, the court would of course revisit this issue.

*Ass'n v. Miller,* 934 F.2d 1462, 1464–66 n. 2 (11th Cir.1991).[11]

For the foregoing reasons, the court concludes that the plaintiffs have ·satisfied the standing component of the case-or-controversy requirement. However, before it may put aside its copy of Article III, the court must address another aspect of the case-or-controversy requirement, namely whether the plaintiffs' claims have been rendered moot by the attorney general's letter to the four district attorneys regarding enforcement of the partial-birth abortion statute. This issue is taken up in the following section.

### ii. Mootness

As a threshold matter, the court notes that the mootness contention is limited to the plaintiffs' claims concerning the partial-birth abortion statute, because the attorney general's directive expressly pertained only to that statute. Nothing in the record indicates that the attorney general has placed any limitation on the enforcement of the post-viability abortion statute.

The plaintiffs aptly analogize the mootness issue presented here to claims of mootness grounded on a defendant's "voluntary cessation" of challenged conduct. The analogy fits because, as explained below, there is no evidence to suggest that the attorney general's letter can be deemed binding for all time and for all possible future prosecutions under the statute. Rather, the letter is more accurately construed as an expression of the attorney general's current, but readily alterable, position.

The Supreme Court has emphasized the stringency of the test for mootness under such circumstances, in recognition of the fact that "the defendant is free to return to his old ways." *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 & n. 10, 102 S.Ct. 1070, 1074 & n. 10, 71 L.Ed.2d 152 (1982); *United States v. W.T. Grant Co.,* 345

U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *see also Secretary of Labor v. Burger King Corp.,* 955 F.2d 681, 684 (11th Cir.1992). Thus, a case may be moot only if it becomes "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203–204, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). The "heavy burden" to make this showing rests squarely on the defendants' shoulders. *See Burger King,* 955 F.2d at 684. At least one court has held that the voluntary cessation must be legally binding and judicially enforceable. *See Kidder, Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556, 563 (2d. Cir.) (holding that the defendant's mere promise to abstain from the challenged action, in the absence of a binding settlement or other judicially-enforceable agreement, does not render the controversy moot), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991).

On the record before it, the court concludes that the attorney general defendants have failed to meet their heavy burden of establishing that the voluntary decision to place limitations on prosecutions under the partial-birth abortion statute is permanent. Nothing in the record persuades the court that the letter, even if it is binding on the district attorneys to whom it was addressed, is not subject to revision or rescission at the attorney general's sole discretion. In the letter itself, the attorney general stated that he relied upon 1975 Ala.Code § 36–15–14 (Michie 1991) in instructing the district attorneys regarding how the partial-birth abortion statute was to be construed for enforcement purposes. That provision provides in pertinent part as follows: "The attorney general ... may at any time he sees proper, either before or after indictment, superintend and direct the prosecution of any criminal case in any of the courts of this state." [12] As counsel

11. The plaintiffs contend ·that under Alabama criminal law pertaining to corporate and accomplice liability principles, the clinics would indeed be exposed to criminal liability for the acts of the physicians and other medical personnel under their employ. As stated, however, the court will not address these arguments because Dr. Knorr, as an individual physician, enjoys standing to sue.

12. A second provision of the 1975 Alabama Code, § 36–15–15 (Michie 1991), provides that the attorney general "shall give the district attorneys of the several circuits any opinion, instruction or advice necessary or proper to aid them in the proper discharge of their duties, either by circular or personal letter." The plaintiffs contend that this provision is the actual authority under which the attorney general instructed the district attorneys regarding the interpretation of the partial-birth abortion statute. Whether this

for the attorney general defendants conceded during the hearing held regarding the pending motion to dismiss, this provision does not bind the current attorney general, nor any of his successor attorneys general, to the construction of the statute set forth in the letter. Thus, the attorney general is free to change his mind at any time regarding how the statute is to be construed for purposes of prosecuting potential violators.

The court's conclusion that the attorney general's letter is not a binding interpretation of the statute, but is simply a non-binding statement of his present intent not to prosecute pre-viability abortions under the act, is further reinforced by an additional concession made by the attorney general at the hearing. Specifically, the attorney general acknowledged that the letter would not preclude the state from bringing prosecutions in the future against physicians who had performed pre-viability abortions *even while the attorney general's letter was in force.* In other words, the attorney general was not only unwilling to state that pre-viability partial-birth abortions performed some time in the future would not be subject to prosecution, but he also refused to rule out the possibility that physicians risked future prosecution for performing abortions that appeared, in view of the opinion letter, to be lawful at the time they were performed. If the opinion letter were in fact a binding interpretation of the statute, such prosecutions would not be possible, and physicians could rest assured that performance of pre-viability partial-birth abortion procedures would not subject them to prosecution if performed while the letter is in force.

Under these circumstances, it simply is not "absolutely clear" that the allegedly unconstitutional enforcement of the partial-birth abortion act could not reasonably be expected to take place some time in the future, and the court therefore concludes that the plain-

tiffs' claims have not been rendered moot by the attorney general's letter. *See Concentrated Phosphate,* 393 U.S. at 203–204, 89 S.Ct. at 364.[13]

This conclusion is particularly appropriate in the context of a criminal abortion statute, given the unquestionable political nature of decisions regarding how, when, and against whom to enforce such statutes, as well as the acute sensitivity of these decisions to the force and direction of the prevailing winds of public opinion. In view of these considerations, there is little reason to suspect that the position currently staked out by the state attorney general will not eventually shift, perhaps to one that permits prosecutions to be brought against the plaintiffs who initiated this lawsuit or other physicians who perform similar abortion operations, not only as to future conduct, but even for past conduct that occurred while the present opinion letter was in effect.

This conclusion is not at odds with the decision in *Saladin v. City of Milledgeville,* 812 F.2d 687 (11th Cir.1987), where the Eleventh Circuit found that the controversy concerning the defendant city's public display of its seal, which bore the word "Christianity," had been rendered moot by the city's agreement to remove the seal from several prominent locations. The Eleventh Circuit explained its decision by noting that the city had "promised not to display them there in the future," and that there did not appear to be any basis for believing that the city would "break its word." *Id.* at 693. By contrast, here there is absolutely no indication that the defendants have made any such promises regarding the permanence of the current limitation placed upon prosecutions under the partial-birth abortion act.

Accordingly, the court holds that the plaintiffs have satisfied the requirement imposed

contention is correct or not is immaterial for purposes of deciding the mootness question, however, because this provision, like § 36–15–14, does not render the attorney general's construction of the statute binding on him or his successors, who are free to revise or rescind their interpretation at any time.

**13.** The plaintiffs also make much of the fact that the attorney general and the governor have

adopted inconsistent positions regarding the appropriate scope of enforcement of the partial-birth abortion act, with Governor James indicating that he intends to enforce it to the fullest possible extent. The court declines to address this argument, however, because it concludes that even in the absence of such a conflict the attorney general's letter constitutes insufficient evidence that the allegedly unconstitutional application of the statute will not be pursued.

by Article III that they present a genuine case or controversy for adjudication by the court. Thus, this court has jurisdiction to hear all of the plaintiffs claims against the defendants. However, before proceeding to the determination of whether the plaintiffs have alleged a claim upon which relief may be granted, the court must determine whether there are sufficient reasons for it to abstain from hearing this lawsuit despite the existence of a jurisdictional basis, as the attorney general defendants contend. The court will address this question of abstention in the following section.

## C. Abstention Doctrines

The attorney general defendants argue that this court should abstain from adjudicating the plaintiffs' claims for declaratory and injunctive relief, even though an Article III case or controversy has been presented, on the basis of at least three distinct, but related and somewhat overlapping, doctrines. First, the attorney general defendants seek to invoke the abstention doctrine first articulated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which counsels that federal courts should abstain under certain circumstances to avoid interference with state-court proceedings. Second, the attorney general defendants contend that the court should refuse to hear the plaintiffs' claims for equitable relief because they have failed to establish the basic requisites imposed by courts for the issuance of such relief.[14] Finally, the attorney general defendants rely upon the abstention doctrine most commonly associated with *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), under which federal courts are to refrain from adjudicating constitutional challenges to state action where there are unclear questions of state law that, if resolved by state courts, could obviate the need to decide the constitutional question. The court will address each of these contentions in turn below.

### i. *Younger* Abstention

■ The first doctrine that the attorney general defendants enlist in their effort to convince the court to abstain from hearing the present lawsuit, which is commonly referred to as *Younger* abstention,[15] emerged from the Supreme Court's examination of the considerations of equity, comity, and federalism that arise when the federal jurisdiction over a matter could potentially interfere with related state-court proceedings. *See Steffel v. Thompson*, 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974). Where such interference is a strong possibility, the Supreme Court has commanded federal courts to abstain from hearing the plaintiffs' claims for equitable relief except under "extraordinary circumstances," where the alleged irreparable injury is "both great and immediate." *Younger*, 401 U.S. at 46, 52, 91 S.Ct. at 751, 755; *see also Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 509, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257 (1972); *Ealy v. Littlejohn*, 569 F.2d 219, 231 (5th Cir. 1978). The attorney general defendants seek to import into this lawsuit these all-but-insurmountable hurdles to the exercise of the court's jurisdiction over the plaintiffs' claims, and argue that because the plaintiffs cannot establish that this is an extraordinary case they should be compelled to attempt to vindicate their asserted rights in a state-court proceeding.

The attorney general defendants fail in this effort to smother the plaintiffs' claims for federal declaratory and injunctive relief under the heavy blanket of requirements imposed by the *Younger* doctrine, however, because they ignore a critical underpinning of the Supreme Court's decision in *Younger*. Central to that decision was the fact that the Court was presented with a lawsuit in which the sole plaintiff whose claims were reached on the merits sought an injunction to stop a state criminal prosecution that was not merely threatened, but was actually pending against him at the time. The Court held that

---

**14.** Although this equity-based doctrine technically may not be considered an abstention doctrine, the court nevertheless addresses it in this section because the issues raised are closely related to those considered in deciding the *Younger* and *Pullman* abstention questions.

**15.** Justice Black, writing for the majority in *Younger*, termed the considerations of comity underlying that decision "Our Federalism." 401 U.S. at 44–45, 91 S.Ct. at 750–51.

federal courts should, under ordinary circumstances, refrain from issuing such an injunction against ongoing state criminal proceedings. As the Court explained in *Steffel*, this holding stemmed from its recognition that such proceedings, "in all but unusual cases, would provide the federal plaintiff with the necessary vehicle for vindicating his constitutional rights, and, in that circumstance, the restraining of an ongoing prosecution would entail an unseemly failure to give effect to the principle that state courts have the solemn responsibility, equally with the federal courts to guard, enforce, and protect every right granted or secured by the constitution of the United States." 415 U.S. at 460–461, 94 S.Ct. at 1216 (internal quotation marks and citation omitted).

 As the Supreme Court has emphasized in its post-*Younger* decisions, that case and its progeny "were premised on considerations of equity practice and comity in our federal system that have little force in the absence of a pending state proceeding." *Lake Carriers' Ass'n*, 406 U.S. at 509, 92 S.Ct. at 1757. The Court has further explained: "When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles. In addition, while a pending state prosecution provides the federal plaintiff with a concrete opportunity to vindicate his constitutional rights, a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel*, 415 U.S. at 462, 94 S.Ct. at 1217.

 Thus, where, as here, the plaintiffs do not seek declaratory or injunctive relief against an ongoing state criminal prosecution, the heightened requirements imposed by *Younger* for the exercise of federal

court jurisdiction over the plaintiffs' claims for equitable relief are not triggered. Instead, as the Court explained in *Lake Carriers' Ass'n*, absent a pending state prosecution, "exercise of federal court jurisdiction is appropriate if the conditions for declaratory or injunctive relief are met." 406 U.S. at 509–10, 92 S.Ct. at 1757. The court will address the question of whether the plaintiffs have satisfied these conditions below.

The attorney general defendants also point to *Fenner v. Boykin*, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926), upon which the Supreme Court placed heavy reliance in *Younger*, in support of their contention that this court should abstain from hearing the plaintiffs' claims.[16] *Fenner*, unlike *Younger*, but like the instant dispute, did concern an attempt to obtain federal injunctive relief against a state criminal prosecution prior to its initiation. In expansive language seemingly applicable—and possibly fatal—to this action, the Court noted that:

> "*Ex parte Young* and following cases have established the doctrine that when absolutely necessary for protection of constitutional rights, courts of the United States have power to enjoin state officers from instituting criminal actions. But this may not be done, except under extraordinary circumstances, where the danger of irreparable loss is both great and immediate. Ordinarily, there should be no interference with such officers; primarily, they are charged with the duty of prosecuting offenders against the laws of the state, and must decide when and how this is to be done. The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection. The Judicial Code provides ample opportunity for ultimate review here in respect of federal questions. An intolerable condition would arise, if, whenever about to be charged with violating a state law, one were permit-

---

**16.** In fact, *Fenner* was the source of the great and immediate' irreparable injury standard adopted by the Court in *Younger*. *See Younger*, 401 U.S. at 45, 91 S.Ct. at 751.

ted freely to contest its validity by an original proceeding in some federal court." *Fenner,* 271 U.S. at 243–44, 46 S.Ct. at 493.

Thus, *Fenner* appears, at first blush, to mandate that the court exercise its jurisdiction over the plaintiffs' claims here only if the heightened, *Younger*-type standards are satisfied—that is, if the plaintiffs have presented an "extraordinary case" involving a great and immediate danger of irreparable loss. However, the Supreme Court has explained that *Fenner* applies "in those cases where injunctive relief has been sought to restrain an imminent, but not yet pending, prosecution *for past conduct.*" *Steffel,* 415 U.S. at 463 n. 12, 94 S.Ct. at 1218 n. 12 (emphasis in original). Where the plaintiffs' potential liability under the criminal statute stems from acts that have already occurred, then, the Supreme Court will find, in the ordinary case, that the equity and comity based considerations disfavor the exercise of federal jurisdiction over the plaintiffs' claims for declaratory and injunctive relief. The *Steffel* Court expressly left open the possibility, however, that claims for equitable relief may be heard by federal courts where, "although no prosecution is pending or impending, an individual demonstrates that he will be required to *forgo* constitutionally protected activity in order to avoid arrest." *Id.* (emphasis in original). Thus, the Supreme Court has concluded that potential criminal liability for prospective, as opposed to past, conduct on the part of the plaintiff does not necessarily implicate the comity and equity-based considerations that counsel application of the stringent *Younger* and *Fenner* standards. The instant dispute, in which the plaintiffs' claims for equitable relief explicitly are grounded on their allegations that they must forgo constitutionally protected activity in order to avoid arrest, falls squarely within the realm of cases for which *Steffel* left open the possibility of federal-court jurisdiction. Accordingly, the court declines the attorney general defendants' invitation to abstain from hearing this action on the basis of the principles enunciated in *Fenner, Younger,* and their progeny.

### ii. Equity Principles

As stated, once the court determines that the plaintiffs' claims have withstood the test imposed by the *Younger* abstention doctrine, it must next ascertain, based upon the application of traditional equity principles, whether jurisdiction may be exercised over the plaintiffs' requests for equitable relief. *See Lake Carriers' Ass'n,* 406 U.S. at 509, 92 S.Ct. at 1757 (in the absence of a pending state criminal prosecution, "exercise of federal court jurisdiction ordinarily is appropriate if the conditions for declaratory or injunctive relief are met"); *see also Steffel,* 415 U.S. at 462, 94 S.Ct. at 1217; *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 380–81, 112 S.Ct. 2031, 2035, 119 L.Ed.2d 157 (1992). Here, the plaintiffs seek both a declaratory judgment that the challenged abortion statutes are unconstitutional, and injunctive relief against the defendants to prohibit them from enforcing the statutes. In view of how the treatment by the Supreme Court of these distinct forms of equitable relief has evolved, the court must address them separately.

■ The question of whether this court may hear the plaintiffs' claims for declaratory relief is quickly resolved by reference to the Supreme Court's decision in *Steffel.* As noted above, that case concerned a federal lawsuit challenging a state criminal statute that had been initiated prior to the commencement of any state proceedings against the plaintiff. Observing that the principles of comity, equity, and federalism underlying *Younger* and its progeny had little force in such a context, and expressly reserving for another day the question of whether federal injunctive relief may be granted, the Court did hold that federal declaratory relief was available under such circumstances. *Steffel,* 415 U.S. at 460–475, 94 S.Ct. at 1216–24. To be eligible for declaratory relief, the Court held, a plaintiff must demonstrate that he or she faces a genuine threat of enforcement of the challenged state criminal statute. *Id.* at 475–76, 94 S.Ct. at 1223–24.

■ As previously noted, no criminal or civil proceedings in state court have been initiated against the plaintiffs here on the basis of the two disputed abortion statutes, but the plaintiffs have indeed established the existence of a genuine threat of such enforcement. Accordingly, the court concludes that it may exercise jurisdiction over the plain-

tiffs' claims for declaratory relief in view of *Steffel.*

Whether the court should also adjudicate the plaintiffs' claims for injunctive relief presents a substantially less straight forward question. Because, as noted, *Steffel* left this question unanswered, its resolution requires an examination of subsequent Supreme Court decisions.

■■■■ The former Fifth Circuit Court of Appeals undertook just such an examination in *Ealy v. Littlejohn,* 569 F.2d 219 (5th Cir.1978).[17] Specifically, the court reviewed two post-*Steffel* decisions of the Supreme Court, *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), which addressed whether the issuance of a preliminary injunction is barred by the equitable considerations underlying *Younger,* and *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), which addressed the same question regarding a permanent injunction. The former Fifth Circuit concluded on the basis of these decisions that *Younger* does not preclude the granting of federal injunctive relief provided the plaintiff can clear the following hurdles: (1) satisfaction of the requirements of federal jurisdiction; (2) demonstration of the existence of "exceptional circumstances"; and (3) demonstration that an injunction is necessary for the adequate protection of the plaintiff's constitutional rights. The Supreme Court has explained the fact that plaintiffs seeking injunctive, as opposed to declaratory, relief must overcome these additional barriers as follows: "although [o]rdinarily ... the practical effect of injunctive and declaratory relief will be virtually identical, a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." *Wooley,* 430 U.S. at 711, 97 S.Ct. at 1433–34 (internal quotation marks and citations omitted).[18]

Because this court has already determined that the plaintiffs here have satisfied all other federal jurisdictional requirements for their claims for permanent injunctive relief, only the second and third showings described in *Ealy* remain at issue. While the intended meaning of "exceptional circumstances," as employed in the second requirement, is far from crystal clear, it does appear to erect a rather high barrier to the issuance of federal injunctive relief.[19] For instance, in *Wooley,* the Court found that three successive prosecutions of the plaintiff in five weeks, with the threat of repeated prosecutions in the future against both him and his wife, satisfied this requirement and justified federal injunctive relief. 430 U.S. at 712, 97 S.Ct. at 1434. The Court intimated that a single threatened prosecution, absent earlier proceedings brought against the plaintiffs under the same disputed statute, will not constitute "extraordinary circumstances," stating that the scenario presented in *Wooley* "is quite different from a claim for federal equitable relief when a prosecution is threatened for the first time." *Id.; see Spencer v. Honorable Justices of Supreme Court of Pa.,* 579 F.Supp.

---

**17.** In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**18.** In *Doran,* the Supreme Court held that *preliminary,* as opposed to permanent, injunctive relief may be awarded even absent satisfaction of the stringent *Younger* standards. 422 U.S. at 930, 95 S.Ct. at 2567.

**19.** The relationship, in terms of relative stringency, of the 'exceptional circumstances' benchmark applicable here, and the 'extraordinary circumstances' standard enunciated in *Fenner* and *Younger,* is all but impossible to ascertain. The court does note, however, that *Wooley* derived the 'exceptional circumstances' formula from *Spielman Motor Sales Co. v. Dodge,* 295 U.S. 89,

95, 55 S.Ct. 678, 680, 79 L.Ed. 1322 (1935), one of the decisions that the Court cited in *Younger* to justify its adoption of the 'extraordinary circumstances' standard it established for cases involving pending state prosecutions. *See Younger,* 401 U.S. at 45–46, 91 S.Ct. at 751. Thus, it is difficult to conclude that the two standards are anything but equivalent. If this is true, then *Younger* is far from moribund in the context of pre-enforcement challenges to state criminal statutes, where injunctive, rather than mere declaratory, relief is sought. The Court in *Wooley* appeared to say as much, when it noted that "generally a court will not enjoin the enforcement of a criminal statute even though unconstitutional, since such a result seriously impairs the State's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of *Younger.*" 430 U.S. at 711–12, 97 S.Ct. at 1434 (citations and internal quotation marks omitted).

880, 892–93 (E.D.Pa.1984) (finding no exceptional circumstances because plaintiff faced only his first threat of prosecution under the challenged provision of the Pennsylvania Code of Professional Responsibility), *aff'd,* 760 F.2d 261 (3d Cir.1985) (table).

■■■■ Because there is no prior record of prosecutions brought against any of the plaintiffs under the two challenged Alabama abortion statutes, and in view of the fact that the court sees no reason to question the soundness here of the Supreme Court's observation that a federal plaintiff's interest can be protected by issuance of a declaratory judgment alone, the court concludes that the requisite "exceptional circumstances" are not present. Accordingly, the court will refrain from hearing the plaintiffs' claims for injunctive relief, but will exercise jurisdiction over this lawsuit only to the extent that the plaintiffs seek a declaratory judgment that the two abortion statutes are unconstitutional.[20]

### iii. *Pullman* Abstention

■■■■ In their final effort to convince the court to abstain from hearing the plaintiffs' claims, the attorney general defendants invoke the *Pullman* doctrine, which counsels abstention if "difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). The Supreme Court has cautioned that such abstention is to be exercised "only in narrowly limited 'special circumstances' where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d

260 (1973); *see also Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 306, 99 S.Ct. 2301, 2312–13, 60 L.Ed.2d 895 (1979) (such abstention "may be required 'in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication.'") (quoting *Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965)).

■■■■ Thus, two requirements must be met for *Pullman* abstention to apply: (1) there must be an unsettled issue of state law; and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised. *Palmer v. Jackson,* 617 F.2d 424, 428 (5th Cir.1980); *see also High Ol' Times, Inc. v. Busbee,* 621 F.2d 135, 139 (5th Cir.1980) (noting that the court should also consider "whether a federal decision could later conflict with subsequent state court resolutions concerning the same regulatory program or scheme, thus engendering more confusion"). It is important to note, however, that abstention is not to be applied merely to permit the state courts to adjudicate the constitutionality of the state statute on the basis of federal constitutional law. *Duke v. James,* 713 F.2d 1506, 1510 (11th Cir.1983).

■■■■ Here the plaintiffs contend, among other things, that the challenged abortion statutes are unconstitutionally vague.[21] This, of course, raises a question of unclear state law, and thus militates in favor of abstention by this court to permit the Alabama courts to clarify the meaning of the statutes. However, as is characteristic of all the abstention doctrines addressed here, the analysis is not so straightforward, for "not every vagueness

---

**20.** The court recognizes that the question of whether to abstain from hearing the plaintiffs' claims for injunctive relief and the question of whether such relief should be granted are distinct, and that the latter inquiry requires that the court reach the merits of the plaintiffs' claims. *See Lake Carriers' Ass'n,* 406 U.S. at 509 n. 13, 92 S.Ct. at 1756 n. 13 (noting that the two inquiries are distinct); *see also Polykoff v. Collins,* 816 F.2d 1326, 1333 (9th Cir.1987). However, because the court has concluded that, under the pertinent Supreme Court and former Fifth Circuit authorities, the plaintiffs' have failed to overcome the threshold abstention impediments to exercise of the court's jurisdiction over their claims for injunctive relief, the merits of these claims need not be reached.

**21.** The plaintiffs' other challenges to the constitutionality of the two abortion statutes do not implicate the concerns underlying the *Pullman* doctrine, because they simply question whether application of the disputed, but clear and unambiguous, provisions would violate the constitution.

challenge to an uninterpreted state statute or regulation constitutes a proper case for abstention." *Procunier v. Martinez*, 416 *U.S.* 396, 401, 94 S.Ct. 1800, 1805, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

■■■ As the Court explained in *Procunier*, two kinds of vagueness attacks must be distinguished for purposes of determining whether *Pullman* abstention is appropriate. "Where the case turns on the applicability of a state statute or regulation to a particular person or a defined course of conduct, resolution of the unsettled question of state law may eliminate any need for constitutional adjudication. [*Baggett v. Bullitt*, 377 U.S. 360, 376–77, 84 S.Ct. 1316, 1325–26, 12 L.Ed.2d 377 (1964)]. Abstention is therefore appropriate." *Procunier*, 416 U.S. at 401 n. 5, 94 S.Ct. at 1805–06 n. 5. However, "[w]here ... the statute or regulation is challenged as vague because individuals to whom it plainly apples simply cannot understand what is required of them and do not wish to forswear all activity arguably within the scope of the vague terms, abstention is not required. [*Baggett*, 377 U.S.] at 378, 84 S.Ct. at 1326. In such a case no single adjudication by a state court could eliminate the constitutional difficulty. Rather it would require 'extensive adjudications, under the impact of a variety of factual situations,' to bring the challenged statute or regulation 'within the bounds of permissible constitutional certainty.' *Ibid.*" *Procunier*, 416 U.S. at 401 n. 5, 94 S.Ct. at 1805–06 n. 5.

Here, the plaintiffs level six separate vagueness challenges against the two abortion statutes. With respect to the partial-birth abortion statute, the plaintiffs contend the following: (1) that the definition of a partial-birth abortion provided in the statute, as one "in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery," is unconstitutionally vague as to which types of abortion procedures it describes; and (2) that this definition is also unconstitutionally vague as to what is meant by a "living fetus." With respect to the post-viability abortion statute, the plaintiffs make the following vagueness allegations: (1) that the statute is unconstitutionally vague because its exception for cases in which abortions are medically necessary imposes both "objective" and "subjective" standards on physicians' determination of medical necessity; (2) that the statute is unconstitutionally vague because physicians' determinations of whether a medical emergency prevents compliance with several procedural requirements are also governed by a dual "objective" and "subjective" standard; (3) that the statute is also unconstitutionally vague because it employs both "objective" and "subjective" standards for determining whether a fetus is viable; and (4) that the statute is also unconstitutionally vague in mandating viability testing after "19 weeks of pregnancy" without providing a clear and unambiguous methodology for measuring fetal age.[22]

■■■ First, regarding the two vagueness challenges against the partial-birth abortion

---

**22.** Although the precise nature of this fourth challenge to the post-viability abortion statute is unclear, it appears to be premised on the inclusion in the post-viability abortion statute of at least two methodologies for calculating fetal age for purposes of determining when viability testing is required under § 26–22–4, which mandates such testing prior to performing an abortion after the woman's "first 19 weeks of pregnancy." Specifically, the plaintiffs point to the allegedly contradictory benchmarks provided in § 26–22–2(3), which defines "Gestational age" as "The age of the unborn child as calculated from the first day of the last menstrual period of the pregnant woman," and in § 26–22–2(7), which defines "Pregnant" as a condition that "commences with fertilization." According to the plaintiffs, these distinct measurements may differ by as many as two weeks.

Apparently because the terms "pregnancy" and "gestation" are roughly synonymous, *see* Webster's Third New International Dictionary 952, 1788 (1976) (defining the two terms as synonyms), the plaintiffs contend that either of these two possible measurements of fetal age may reasonably be employed for purposes of § 26–22–4, which refers to "pregnancy" without explicitly stating when this condition commences, but that the statute fails to specify which is to be used.

In addition, to further complicate matters, it appears that this fourth challenge to the post-viability abortion statute is not actually alleged in the plaintiffs' complaint. Although the defendants have not taken issue with this omission, the plaintiffs should still amend their complaint, within 14 days, to state this challenge in clear terms.

statute and the fourth vagueness challenge to the post-viability abortion statute, the court concludes that the interpretive issues, which underlie the challenges, should be certified to the Alabama Supreme Court pursuant to Rule 18 of the Alabama Rules of Appellate Procedure,[23] with the result that the need for abstention, or more appropriately, deferral, under the *Pullman* doctrine is pretermitted.[24] Were the Alabama Supreme Court to construe the term "living" to refer to a "viable" fetus, the constitutional questions raised by the plaintiffs' claims would differ substantially from those that would arise if "living" were defined as containing any living tissue or cells, and either interpretation would clarify the nature of the proscribed conduct. Indeed, at the hearing on the defendants' motions, the plaintiffs conceded that such a construction would moot this part of their vagueness challenges. Similar clarification would result from a declaration by the State Supreme Court as to which specific abortion techniques (*e.g.*, traditional and intact dilation and evacuation, etc.) are proscribed by the act because the physician performs the abortion by "partially vaginally deliver[ing] a living fetus before killing the fetus and completing the delivery," as specified in § 26–23–2(3) of the statute. Finally, with regard to the plaintiffs' fourth challenge to the post-viability abortion statute, which mandates a viability test where the woman is past "her first 19 weeks of pregnancy," should the Alabama Supreme Court determine that the requisite measurement of fetal age commences with fertilization under the statutory scheme, and not the first day of the woman's lmp, the statute would be sufficiently clarified to extinguish another of the plaintiffs' vagueness claims. By pursuing this course of action, the court heeds the counsel of the unanimous Supreme Court in *Arizonans for Official English v. Arizona*, —— U.S. ——, ——, 117 S.Ct. 1055, 1072–73, 137 L.Ed.2d 170 (1997), where the Court observed that certification to the state's highest court will succeed in "reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response."

However, the court concludes that it should neither certify to the Alabama Supreme Court, nor abstain from hearing, under *Baggett* and *Procunier*, the plaintiffs' vagueness challenges against the post-viability abortion statute that are premised on the alleged imposition of mixed subjective and objective standards on physicians' conduct (challenges (1) through (3) above). These challenges are not directed to provisions that are susceptible to a reasonable limiting construction by the Alabama courts that would obviate or substantially modify this court's adjudication of the constitutionality of the disputed provisions. Instead, as was the case in *Procunier*, these provisions are challenged as vague because individuals to whom they plainly apply—physicians who perform abortions on potentially viable fetuses—cannot understand with certainty the nature of the proscribed conduct, and they do not intend to forswear all constitutionally-protected activity arguably within the scope of the vague terms. *See Procunier*, 416 U.S. at 401 n. 5, 94 S.Ct. at 1805 n. 5. Moreover, given the complexity of the alleged infirmities in the challenged provisions, and the myriad

---

**23.** Rule 18 of the Alabama Rules of Appellate Procedure provides, in pertinent part, as follows:

"When it shall appear to a court of the United States that there are involved in any proceeding before it questions or propositions of law of this State which are determinative of said cause and that there are no clear controlling precedents in the decisions of the Supreme Court of this State, such federal court may certify such questions or propositions of law of this State to the Supreme Court of Alabama for instructions concerning such questions or propositions of state law, which certified question the Supreme Court of this State, by written opinion, may answer."

Pursuant to this provision, federal district courts may certify questions to the Alabama Su-

preme Court. *See, e.g., Tectonics, Inc. v. Castle Const. Co.*, 496 So.2d 704 (Ala.1986) (Alabama Supreme Court answers question certified by this court).

**24.** In *Growe v. Emison*, 507 U.S. 25, 32 n. 1, 113 S.Ct. 1075, 1080 n. 1, 122 L.Ed.2d 388 (1993), the Supreme Court wrote: "To bring out more clearly ... the distinction between those circumstances that require dismissal of a suit and those that require postponing consideration of its merits, it would be preferable to speak of *Pullman* 'deferral.' *Pullman* deferral recognizes that federal courts should not prematurely resolve the constitutionality of a state statute...." Certification to the Alabama Supreme Court of these questions is tantamount to *Pullman* deferral of the claims in which the questions are presented.

potential factual settings in which problems of vague application of the statute may arise, the court finds, as was also true in *Procunier*, that no single adjudication by a state court could eliminate the constitutional difficulty, but rather that "extensive adjudications, under the impact of a variety of factual situations" would be required to draw the statute "within the bounds of permissible constitutional certainty." *See id.* The accuracy of this observation is confirmed below when the court grapples with the question of whether these vagueness challenges state a claim upon which relief may be granted.

For the foregoing reasons, the court finds that it has jurisdiction to hear all of the plaintiffs' claims, to the extent that they seek declaratory, as opposed to injunctive, relief. The court will, however, refrain from hearing the three vagueness challenges described above until the Alabama Supreme Court has an opportunity to construe the pertinent provisions of the challenged acts, pursuant to the questions certified by this court.[25]

Accordingly, in the remaining sections of this memorandum opinion the court will address the question of whether dismissal of the lawsuit is required because, as the defendants contend, the plaintiffs have failed to state any claim upon which relief may be granted.

## V. ATTORNEY GENERAL DEFENDANTS' CONTENTIONS THAT PLAINTIFFS HAVE FAILED TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

As stated, in considering a defendant's motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, the court accepts the plaintiff's factual allegations as true, and the action may not be dismissed unless it appears to a certainty that the plaintiff can offer no set of facts supporting the relief requested.

The attorney general defendants attack the following vagueness allegations made by the plaintiffs as failing to state a claim upon which relief can be granted: (1) that the partial-birth abortion statute is unconstitutionally vague as to which abortion procedures fall within its definition of a "partial-birth" abortion; (2) that the partial-birth abortion statute is unconstitutionally vague as to what is meant by the term "living fetus;" and (3) that the post-viability abortion statute is unconstitutionally vague as to how physicians are to determine (a) whether a fetus is viable, (b) whether an abortion is necessary to prevent the death of the woman or the substantial and irreversible impairment of her health, (c) whether a medical emergency prevents compliance with the statute's procedural requirements for conducting and documenting the abortion, and (d) whether the abortion takes place after "19 weeks of pregnancy," for purposes of ascertaining whether viability testing is required. With the exception of allegations (1), (2) and (3)(d), the determination of which will be postponed pending the Alabama Supreme Court's interpretation of the pertinent statutory provisions, the court will address whether the plaintiffs have succeeded in stating a claim regarding each of these allegations.

In addition to the foregoing vagueness challenges, the attorney general defendants also contend that the following allegations fail to state a claim: (1) that the partial-birth abortion statute unconstitutionally imposes an undue burden on women seeking pre-viability abortions, to the extent that it prohibits the most common and safest abortion procedures, and to the extent that it imposes a substantial obstacle on women's choice of abortion method; (2) that the partial-birth abortion statute is unconstitutional even if limited to post-viability abortions because it lacks any exception for preserving maternal health; (3) that the partial-birth abortion statute is unconstitutional because its civil liability provisions impose an undue burden on women seeking pre-viability abortions; and (4) that the post-viability abortion statute is unconstitutional because it impermissibly forces a "trade-off" between the woman's health and fetal survival, and fails to ensure that maternal health remains the physician's paramount concern.[26] The court will address

---

**25.** *See supra* note 24.

**26.** The attorney general defendants apparently do not contend that the plaintiffs have failed to

state claims upon which relief may be granted as to the following two allegations in the complaint: (1) that both statutes violate the equal protection clause, and (2) that the partial-birth abortion

**1440**

whether each of these allegations survives the attorney general defendants' motion to dismiss as well.

### A. Alleged Vagueness of the Post–Viability Abortion Statute

#### i. Legal Standard for Determining Vagueness

■■ The plaintiffs correctly observe that the due process clause of the fourteenth amendment has been construed to prohibit laws sufficiently vague that "persons of common intelligence must necessarily guess at [the laws'] meaning and differ as to [the laws'] application." *Smith v. Goguen*, 415 U.S. 566, 572 n. 8, 94 S.Ct. 1242, 1247 n. 8, 39 L.Ed.2d 605 (1974). Thus, a vague law is unconstitutionally flawed both because it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and because the law's lack of explicit instructions to those who enforce it "impermissibly delegate[s] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972); *see also High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1228–29 (11th Cir.1982).

■■ Moreover, the peril inherent in a vague statute is amplified where, as is alleged here, "the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (invalidating a state abortion statute on vagueness grounds). These concerns are especially significant where those who run afoul of the statute face criminal penalties. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*

*Hoffman Estates. Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982).

The attorney general defendants do not contest the applicability of the foregoing principles to the instant dispute. However, the parties part company over the requisite showing that challengers of a statute must make to establish unconstitutional vagueness. The plaintiffs, relying upon the Supreme Court's decisions in *Kolender v. Lawson*, 461 U.S. 352, 359 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983), and *Colautti*, argue that where the disputed law criminalizes constitutionally protected conduct it should be held vague on its face "even when it could conceivably have had some valid application." The attorney general defendants disagree that this relatively permissive standard governs the inquiry, and instead urge the court to adopt the significantly more restrictive standard articulated in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), and applied to the abortion context in *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 524, 109 S.Ct. 3040, 3060, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring), which requires that the plaintiff establish "that no set of circumstances exists under which the Act would be valid." Thus, the attorney general defendants urge the court to dismiss the plaintiffs' vagueness challenges unless they have alleged facts demonstrating that the disputed statute would be vague in all its possible applications.

■■ The court does recognize that substantial disagreement exists among the Federal Courts of Appeals regarding whether the *Salerno* benchmark for facial challenges to the constitutionality of statutes still governs the analysis in the abortion context in the wake of *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).[27] In fact, the

---

statute interferes with a woman's right to determine the course of her medical treatment, and therefore violates her right to bodily integrity. Consequently, these claims are not addressed in this memorandum opinion.

**27.** The attorney general defendants correctly characterize the plaintiffs' vagueness claims as "facial," as opposed to as applied, because the plaintiffs allege that the statutes are vague on

their very face (that is, as written they would not be clear to the reader), rather than as specifically applied to their conduct. *See Posters 'N' Things, Ltd. v. U.S.*, 511 U.S. 513, 525, 114 S.Ct. 1747, 1754, 128 L.Ed.2d 539 (1994) (addressing allegation of vagueness as applied to a criminal defendant); *see also Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 193–94 (6th Cir.1997) (discussing the distinction between facial and as-applied challenges generally).

court will be called upon to examine this very issue in addressing the plaintiffs' contentions that the partial-birth abortion statute imposes an undue burden on pregnant women who seek an abortion, and that the post-viability abortion statute imposes an unconstitutional "trade-off" between maternal health and fetal survival. However, the court sees no reason why *Salerno* should play any role in a facial challenge to an allegedly *"vague"* act, as opposed to similar attacks grounded upon an act's alleged "overbreadth." [28] In *Salerno* itself, the Supreme Court indicated that the restrictive standard was specifically directed to facial challenges in which problems of "overbreadth" were alleged: "The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." 481 U.S. at 745, 107 S.Ct. at 2100. *See also Evans v. Kelley*, 977 F.Supp. 1283, 1309 n. 27 (E.D.Mich.1997) (rejecting, in the context of a challenge to an abortion statute, an argument that the *Salerno* standard applies to "void-for-vagueness" claims).

■ Moreover, the court notes that, while the Supreme Court has on occasion stated that, in most circumstances, to succeed on a facial void-for-vagueness challenge "the complainant must demonstrate that the law is impermissibly vague in all its applications," it has also recognized that "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497–98, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). In fact, the Court has opined that "perhaps the most important factor affecting the clarity that the Constitution demands of a law is

whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 499, 102 S.Ct. at 1193. These principles are of course consistent with the Court's teaching in *Kolender* and *Colautti* that a criminal statute impinging upon constitutionally-protected conduct should be held vague on its face even when it could conceivably have had some valid application.

Accordingly, the court will apply the less restrictive *Kolender/Colautti* standard in addressing all of the plaintiffs' vagueness attacks on the post-viability statute, and endeavor to ascertain whether the plaintiffs have alleged facts suggesting that the statute fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298–99. If this standard is satisfied, the court will find that the plaintiffs have stated a claim upon which relief may be granted, even if the defendants succeed in establishing that the statute could conceivably have had some valid application.

ii. Application of the Legal Standard to the Plaintiffs' Vagueness Challenges

As stated, the plaintiffs allege that Alabama's post-viability statute is unconstitutionally vague with respect to four separate determinations that it requires physicians to make: (1) the determination as to fetal viability; (2) the determination as to the medical necessity of an abortion to prevent the woman's death or substantial and permanent impairment of her health; (3) the determination as to whether a medical emergency prevents compliance with the statute's procedural requirements; and (4) the determination as to fetal age, for purposes of whether viability testing is required. The court will address the first three of these challenges below, but, as discussed above, will postpone

---

**28.** In facial challenges to the alleged overbreadth of a statute, which most frequently arise in the free speech context, the plaintiff contends that the enactment, even if it permissibly regulates certain conduct, "sweeps too broadly, penalizing a substantial amount" of constitutionally-protected conduct. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37

L.Ed.2d 830 (1973). The vagueness challenges at issue here, however, are distinct from such claims of unconstitutional overbreadth, although overbreadth implications may be drawn from allegations in the complaint that the partial-birth abortion statute may be construed to prohibit certain well-established types of abortion procedures performed by the plaintiffs and other abortion-providers.

its examination of the fourth claim until after the Alabama Supreme Court has had an opportunity to construe the pertinent provisions of the statute in response to the certified questions from this court.

### (a) Vagueness as to Determination of Fetal Viability

The plaintiffs contend that the post-viability abortion statute is unconstitutionally vague in view of the Supreme Court's decision in *Colautti*, because it imposes both "objective" and "subjective" standards on the requisite determination of fetal viability. In *Colautti*, the challenged abortion statute contained a provision that prescribed a standard of care where the person performing an abortion determined that the fetus is viable, or where "there is sufficient reason to believe that the fetus may be viable." 439 U.S. at 391, 99 S.Ct. at 683. The Court found this requirement to be vague and ambiguous in part because it was unclear whether the statute imposed a purely subjective standard, or one that was mixed subjective and objective. The Court concluded that because the determination that the fetus "is viable" was to be based upon the attending physicians' "experience, judgment or professional competence," it was governed by a subjective standard, but it could not ascertain whether the "sufficient reason to believe that the fetus may be viable" language was also to be gauged on a subjective standard, or whether an objective standard was imposed. *Id.* at 391, 99 S.Ct. at 683.

Relying heavily on *Colautti*, the plaintiffs here attempt to convince the court that the Alabama post-viability abortion statute is constitutionally infirm because it also employs a vague standard for judging physician conduct. The plaintiffs first point to § 26–22–3 of the act, which forbids abortions "when the unborn child is viable," but recognizes an exception to this proscription where the physician *"reasonably believes,* after making a determination of the viability of the unborn child in compliance with Section 26–22–4 relating to the determination of viability, that the unborn child is not viable." 1975 Ala.Code § 26–22–3(a) & (b)(2) (Law.Co-op. Supp.1997) (emphasis added). The plaintiffs contend that the "reasonably believes" language imposes both an objective and a subjective standard on physicians. The plain-

tiffs next direct the court's attention to § 26–22–4 of the act, governing viability testing, which mandates that the physician "determine whether, in his or her good faith medical judgment, the [unborn] child is viable." This provision, according to the plaintiffs, imposes a subjective standard, because the physician is to exercise his or her "good faith" judgment in assessing whether the fetus has reached viability. In light of these two provisions, the plaintiffs argue, the statute imposes a mixed subjective and objective benchmark for judging physicians' conduct regarding the viability determination, and thus it contravenes the Court's standard set forth in *Colautti*.

As explained more fully below, the plaintiffs are correct in characterizing the foregoing provisions as imposing a mixed subjective-objective standard on physicians, determinations of fetal viability. However, they misconstrue *Colautti* when they contend that such a mixed standard is necessarily vague in view of that decision. As discussed above, the provision examined in *Colautti* was deemed vague because it was impossible to determine the overall standard that governed the determination of fetal viability; that is, the Court could not ascertain whether the statute imposed a purely subjective standard, or one that was both subjective and objective. By no means did the Court indicate that the challenged statute was unconstitutionally vague merely because it imposed a mixed subjective-objective standard. In fact, there is nothing in *Colautti* to suggest that such a mixed standard, if couched in clear terms, is *per se* vague, as the plaintiffs appear to contend.

Although it declines to read *Colautti* as urged by the plaintiffs, the court does agree with their assertion that the Alabama post-viability abortion statute employs a mixed subjective-objective standard to gauge physicians' determination of fetal viability. Inclusion of the term "reasonably" as a modifier of "believes" in § 26–22–3(b)(2) renders the applicable standard both subjective and objective in nature. That is, the test gauges the *objective* correctness of the physician's *subjective* understanding of the outcome of the viability determination. Thus, it is clear

that the statute imposes a mixed subjective-objective standard on the viability determination: only if the physician believes that the fetus is not viable, and that subjective belief is found to be objectively reasonable, does he or she satisfy the requirements under the statute for performing a post-viability abortion.[29]

This conclusion is consistent with the recent decision in *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187 (6th Cir.1997), in which the Sixth Circuit struck down three major portions of an Ohio act that proscribed and regulated both partial-birth and post-viability abortions. The *Voinovich* court characterized two provisions in the portion of the statute directed to post-viability abortions as imposing a "dual" subjective-and-objective standard because they called for the physician to make certain determinations "in good faith and in the exercise of reasonable medical judgment" 130 F.3d at 204. The court described these provisions as containing "subjective and objective elements in that a physician must believe that the abortion is necessary and his belief must be objectively reasonable to other physicians." *Id.*

As discussed above, the court does not agree that *Colautti* may be read to compel a finding that the mixed standard imposed on physicians by the Alabama post-viability abortion statute is *per se* unconstitutionally vague. However, because the court agrees with the plaintiffs that the post-viability abortion statute's fetal viability testing requirement imposes a mixed subjective-objective standard on physicians, the analysis is not yet complete. Instead, the court must revisit the *Colautti* decision to ascertain whether the concerns expressed by the Supreme Court regarding the perils inherent in an objective standard for judging physician's decisions in the abortion context are implicated by the inclusion of an objective component

in the Alabama statute's governing standard. Specifically, the question remains whether that objective component renders the act unconstitutionally vague by failing to provide adequate notice to physicians as to when their activities fall within the statute's proscription.

As explained above, the viability-determination provisions challenged in *Colautti* were held to be unconstitutionally vague because of the uncertainty regarding whether they employed a purely subjective or a mixed subjective-objective standard. However, the Court also emphasized that adjudging physician conduct under any standard having an objective component is a perilous enterprise, explaining that such a standard, applied "from the perspective of a cross section of the medical community or a panel of experts ..., obviously, portends not an inconsequential hazard for the typical private practitioner who may not have the skills and technology that are readily available at a teaching hospital or large medical center." *Colautti,* 439 U.S. at 391–92, 99 S.Ct. at 684. Additionally, the Court faulted the challenged statute, including the objective component of the standard applied to physicians, for failing to "afford broad discretion to the physician," noting that "Instead, it condition[ed] potential criminal liability on confusing and ambiguous criteria. It therefore present[ed] serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights." *Id.* at 394, 99 S.Ct. at 685.[30]

The court agrees with the plaintiffs that these observations by the Supreme Court strongly suggest that the inclusion of an objective element in the viability-determination provisions of the post-viability abortion statute may render the statute unconstitutionally vague because they could impermissibly stifle physicians' discretion and chill the

---

**29.** Moreover, the plaintiffs' reference to § 26–22–4 of the statute, which also pertains to the physician's determination of fetal viability, bolsters this conclusion. The court agrees with the plaintiffs that this provision imposes a subjective standard on the physician by requiring that he or she exercise "good faith medical judgment," and therefore that the physician must subjectively believe that the fetus is not viable.

**30.** The court recognizes that the Supreme Court reached this conclusion in large part because the nature of the standard applied (purely subjective versus mixed subjective objective) could not be determined with certainty. However, it is also clear that the imposition of an objective test to gauge physician's professional conduct contributed to some degree to this conclusion. *See Colautti,* 439 U.S. at 391–93, 99 S.Ct. at 683–84.

exercise of constitutional rights. The attorney general defendants counter, however, that any vagueness concerns regarding objective standards expressed by the Court in *Colautti* are vitiated here because the challenged provisions of the Alabama statute include a *mens rea* requirement for a finding of liability.[31] In support of this contention, the attorney general defendants cite *Colautti* itself, as well as earlier Supreme Court decisions holding that *mens rea* requirements can cure otherwise vague statutes. This argument appears to raise an issue of first impression for the courts: to date, no court has specifically addressed whether an objective component in a standard for judging physician conduct in the abortion arena is constitutional where liability is conditioned on a finding that the physician had the requisite *mens rea*.[32]

The attorney general defendants are correct to observe that Alabama's post-viability abortion statute conditions liability on a finding that the accused physician satisfies a *mens rea* requirement. Specifically, the statute provides in § 26–22–3(a) that "no person shall intentionally, knowingly, or recklessly perform or induce an abortion when the unborn child is viable."[33] Thus, a physician faces criminal liability under the statute only when he or she intends to perform an abortion involving a viable fetus, knows that he or she is performing such an abortion, or is aware of and consciously disregards the risk that a fetus to be aborted is viable.[34]

The attorney general defendants are also correct to point out that the Court in *Colautti* expressly stated that the absence of any scienter requirement in the viability-determination provision at issue in that case contributed to the holding that the challenged statute was unconstitutionally vague. *See Colautti,* 439 U.S. at 397, 99 S.Ct. at 685–86. However, it must be noted that the *Colautti* Court did not invalidate the disputed statute exclusively on the basis of the absent scienter requirement, but instead merely observed that the vagueness of the statute was "compounded by" its imposition of strict liability. *See id.* at 394, 99 S.Ct. at 685. In fact, the Court expressly declined to decide whether the statute would have been constitutional had it incorporated such a requirement. *See id.* at 396, 99 S.Ct. at 686. Nor did the Court state that an otherwise unconstitutionally-vague statute could be saved by an appropriately-drafted scienter requirement. Thus, only by unreasonably over-extending *Colautti*'s holding could one read that decision to *require* that the Alabama partial-birth abortion statute be found constitutional despite the plaintiffs' vagueness allegations, solely because the statute conditions guilt on a finding of *mens rea*.

■ However, despite the fact that *Colautti* does not compel a holding that the scienter requirement cures any vagueness in the viability-determination provision at issue here, the court must nonetheless examine the

**31.** Inclusion of a *mens rea* requirement means that the defendant must have the requisite "guilty mind" or "criminal intent" in order to be convicted under a statute. *See* Black's Law Dictionary 889 (5th ed.1979) (also defining *"mens rea"* as "guilty knowledge and willfulness"). The related term "scienter" means "knowingly," and is also frequently used to signify the defendant's "guilty knowledge." *See id.* at 1207. The court employs these two terms interchangeably in this order.

**32.** In *Colautti,* as explained more fully below, the Court did not specifically address whether a scienter requirement would adequately allay its fears concerning an objective standard for judging physician conduct. *See Colautti,* 439 U.S. at 396, 99 S.Ct. at 686. Nor did the Sixth Circuit reach this question in *Voinovich. See* 130 F.3d at 205.

**33.** Section 13A–2–2(3) of the Alabama Code defines criminal recklessness as follows:

"A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in that situation."

1975 Ala.Code. § 13A–2–2(3) (Michie 1994).

**34.** Although one could argue that § 26–22–3(a) of the post-viability abortion statute only conditions liability on a finding that the physician had the requisite *mens rea* regarding the fact that he or she was performing an abortion, and not regarding the viability status of the fetus, the court finds that such an interpretation would effectively drain the scienter requirement of all real meaning, and thus concludes that it is with respect to whether the aborted fetus is viable that the requirement applies.

statute to determine whether in view of the *Colautti* Court's reasoning the requirement would in fact cure the alleged vagueness. As the *Colautti* Court noted, the Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*" 439 U.S. at 395, 99 S.Ct. at 685. The Court has indeed observed that otherwise vague statutes may pass constitutional muster where the legislature has thought to limit liability to situations in which the accused has the requisite *mens rea. See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) ("a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); *see also Fargo Women's Health Org., v. Schafer,* 18 F.3d 526, 534–35 (8th Cir.1994) (court's rejection, in light of *Hoffman Estates* and *Colautti,* of a vagueness challenge to an abortion statute based in part upon the existence of a general scienter requirement that the court determined must be imported into the challenged statute); *Evans v. Kelley,* 977 F.Supp. 1283, 1305–06, 1308–09, 1311 n. 29, & 1319 n. 38 (E.D.Mich.1997) (holding that the absence of any scienter element in a partial-birth abortion statute similar to that at issue here exacerbated the vagueness of the definition of the proscribed procedure).

The rationale underlying these decisions was articulated by the Supreme Court in a seminal decision, *Screws v. United States,* 325 U.S. 91, 101–102, 65 S.Ct. 1031, 1035–36, 89 L.Ed. 1495 (1945), as follows:

> "[T]he requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid.... The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."

Similarly, in *Boyce Motor Lines v. United States,* 342 U.S. 337, 342, 72 S.Ct. 329, 331–32, 96 L.Ed. 367 (1952), the Court relied upon this rationale to uphold a statute that conditioned liability on a finding that the accused "knowingly" violated the challenged regulation concerning the transportation of hazardous materials. Once again, the Court emphasized that any alleged vagueness in the prohibition was cured by the inclusion of "culpable intent" as a necessary element in the offense, such that a conviction would only be proper where the violator at the very least *"willfully* neglected to exercise its duty" under the regulation. *id.* (emphasis added). Thus, these decisions establish that where an element of bad faith on the part of the accused is required for conviction under an allegedly vague criminal statute, the Supreme Court is loathe to invalidate the statute as vague for failing to provide adequate notice of the proscribed conduct.

The court recognizes that the foregoing decisions concerned statutes that conditioned guilt on a finding that the accused acted with intent or knowledge in violating the pertinent criminal enactment. Under Alabama's post-viability abortion statute, however, a physician need not intentionally or knowingly perform an abortion on a viable fetus to be convicted; instead, pursuant to § 26–22–3(a) of the statute, the lowest level of culpability for which liability may lie is recklessness on the part of the physician. The Supreme Court apparently has not addressed the question of whether a requirement that the accused have a mental state of recklessness, rather than specific intent or knowledge, can cure an otherwise vague statutory standard.

However, at least one appellate court has answered this question in the affirmative. *See Einaugler v. Supreme Court,* 109 F.3d 836, 842 (2d Cir.1997). In *Einaugler,* the Second Circuit rejected a habeas corpus petitioner's claim that he was convicted under an unconstitutionally vague statute because, among other reasons, the provisions at issue included a scienter requirement. Specifically, the petitioner, a physician, was convicted under a "reckless endangerment" statute that required proof that he had "recklessly engaged in conduct that created a substantial risk of serious physical injury," and for his behavior to be adjudged reckless, he must have "grossly deviated from a reasonable person's standard of conduct and consciously

disregarded a substantial and unjustifiable risk."[35] *See id.* at 840. The Second Circuit, citing *Hoffman Estates* and *Colautti,* held that the requirement that the petitioner's actions be reckless would mitigate any alleged vagueness in the criminal statute, and noted that he was not "punished under the statute for exercising reasonable medical judgment erroneously," but rather that conviction required "that he was aware that the patient required a course of treatment that he did not provide." *Id.*

■ This court agrees with the *Einaugler* court's conclusion that a scienter requirement of recklessness can, in view of the Supreme Court's jurisprudence on the relationship between *mens rea* and vagueness, cure an otherwise vague criminal enactment. Here, as was the case in *Einaugler,* a physician evades punishment under the post-viability abortion statute unless he was aware of, and consciously ignored, a substantial risk that certain circumstances existed. In other words, a physician would not be held strictly liable under the statute merely for erroneously exercising his or her medical judgment; rather, a finding that the physician consciously disregarded a subjectively-known risk that the fetus was viable at the time of the abortion would be necessary to sustain a conviction.

■ Furthermore, the court holds that the concerns voiced by the Supreme Court in *Colautti* regarding the hazards imposed by an objective test of physician conduct are largely allayed by the presence of the scienter requirement in the Alabama post-viability abortion statute. Specifically, the Court's overriding concern that such a standard may function as "a trap for those who act in good faith" is obviated by the fact that a conviction under the statute for an erroneous determination of viability requires a measure of bad faith on the physician's part: he or she must know that a substantial and unjustifiable risk exists that the fetus is viable, and must consciously disregard that known risk. Mere good faith, but mistaken, exercise of professional medical judgment would not support a

conviction under the statute, and thus the "chilling effect" decried in *Colautti* is not a legitimate concern here.

Thus, because the court concludes that any alleged vagueness in the post-viability abortion statute's viability determination provisions would be vitiated by the statute's *mens rea* requirement, the plaintiffs have failed to state a claim upon which relief may be granted concerning the alleged vagueness of these provisions.

(b) Vagueness as to Determination of Necessity to Prevent Woman's Death or Impairment

The plaintiffs also challenge the post-viability abortion statute on the basis of the alleged vagueness of the test it prescribes for physicians to determine whether an otherwise prohibited abortion must be performed to prevent the woman's death or the substantial and irreversible impairment of her health. Specifically, the plaintiffs allege that two provisions of the act pertaining to this determination, like the provisions governing fetal viability discussed above, employ inconsistent objective and subjective standards. The first of these provisions is found in § 26–22–3(b)(1) of the statute, which permits post-viability abortions if the physician performing the abortion "reasonably believes that it is necessary to prevent either the death ... or the substantial and irreversible impairment of a major bodily function of the woman." The plaintiffs allege that use of the term "reasonably believes" in this provision imposes both objective and subjective standards for gauging the physician's determination of medical emergency. The plaintiffs also point to the definition of the term "medical emergency" provided in § 26–22–2(6) of the statute, which reads as follows: "The condition, which, on the basis of the physician's good-faith clinical judgment, so complicates a pregnancy as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible

---

**35.** Similarly, as stated above, under Alabama's criminal code a person acts recklessly when he or she "is aware of and consciously disregards a substantial and unjustifiable risk ... of such nature and degree that disregard thereof constitutes

a gross deviation from the standard of conduct that a reasonable person would observe in the situation." 1975 Ala.Code § 13A2–2(3) (Michie 1994).

impairment of a major bodily function." The reference to "good-faith clinical judgment" in this definition, the plaintiffs allege, imposes a subjective standard regarding the physician's determination that a medical emergency exists.

The court agrees with the plaintiffs' contention. The statute does indeed set forth a mixed subjective-objective in § 26–22–3(b)(1) when it states that the physician must "reasonably believe[ ]" that the abortion is necessary, for the reasons provided above regarding the statute's viability-determination provisions. Thus, like those provisions, the medical emergency exception provisions make it clear that the physician must entertain a subjective belief that the abortion is necessitated by a medical emergency, and this belief is to be assessed under an objective standard of reasonableness.

■ In contrast to the viability-determination standard addressed above, however, the medical emergency exception provisions are not subject to any scienter requirement. While the statute does require that the physician "intentionally, knowingly, or recklessly perform or induce an abortion when the unborn child is viable," this sole scienter requirement cannot reasonably be construed to extend to the physician's decision that the abortion is necessary to avoid death or substantial and irreversible impairment of the woman's health. Thus, no culpability attaches to the physician's determination of medical necessity. Consequently, the court will be required to decide whether the presence of an objective component in the standard for gauging physicians' medical judgments renders these provisions unconstitutionally vague in the absence of a curing *mens rea* requirement.

In making this determination, the court must once again consider the concerns voiced by the Supreme Court in *Colautti* about objective tests of physicians' professional conduct. In view of the plaintiffs' allegations that the determination of whether a medical emergency necessitates a post-viability abortion, like the determination of fetal viability specifically at issue in *Colautti*, is fraught with uncertainty and requires physicians to consider numerous variables, as well as the plaintiffs' allegations that differing opinions among medical personnel put physicians at

risk of criminal prosecution for an incorrect, though good-faith, medical judgment, the court concludes that the "perils of strict liability" described *in Colautti* arise with equal intensity here.

■ As the Court remarked in *Colautti*, where, as here, the specter of medical expert disagreement conjoins with a statute imposing strict criminal and civil liability for an erroneous medical determination, the result could very well be "a profound chilling effect on the willingness of physicians to perform abortions ... in the manner indicated by their best medical judgment." 439 U.S. at 396, 99 S.Ct. at 686. Simply stated, the Alabama post-viability abortion statute, as alleged by the plaintiffs, could permit a physician's good-faith medical judgment to later be second-guessed by experts, and thus could subject him or her to criminal and civil sanctions. As a result, the plaintiffs' allegations that physicians cannot be sure of the standard under which their actions will eventually be adjudged, and that they consequently would be inhibited in the exercise of constitutionally-protected rights, are well founded. Accordingly, the court concludes that the plaintiffs' vagueness challenge against the medical-emergency-determination provisions of the post-viability abortion statute is a claim upon which relief may be granted.

This conclusion is consistent with the recent decision in *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 203–06 (6th Cir.1997), in which the Sixth Circuit affirmed the district court's ruling that a medical emergency exception in an enactment banning post-viability abortions was unconstitutionally vague because it employed both subjective and objective standards, and also lacked any scienter requirement. The *Voinovich* court noted that the medical emergency definition and medical necessity exception in the Ohio statute at issue, both of which required that the physician make determinations "in good faith and in the exercise of reasonable medical judgment," incorporated both subjective and objective standards for evaluating physicians' conduct, and therefore could subject physicians to criminal sanctions even when they exercise their good-faith medical judgment. *Id.* In arriving at its decision to invalidate the post-

viability abortion ban and regulations at issue in *Voinovigh*, the Sixth Circuit made the following observations, which are equally apt here:

> "The determination of whether a medical emergency or necessity exists, like the determination of whether a fetus is viable, is fraught with uncertainty and susceptible to being subsequently disputed by others. Moreover, the lack of a scienter requirement is compounded by the fact that this Act requires that a physician meet both an objective and a subjective standard in order to avoid liability. While we need not decide whether employment of an objective standard with a scienter requirement would be constitutional, *an objective standard without one is especially troublesome in the abortion context*. In an area as controversial as abortion, the need for a scienter requirement is, as the Supreme Court pointed out, particularly important. In this area where there is such disagreement, it is unlikely that the prosecution could not find a physician willing to testify that the physician did not act reasonably. Under the Act, a physician who performs a post-viability abortion under either the medical emergency or medical necessity exception may be held liable, even if the physician believed he or she was acting reasonably, and in accordance with his or her best medical judgment, as long as others later decide that the physician's actions were nonetheless unreasonable."

130 F.3d at 205 (emphasis added).

(c) Vagueness as to Determination of Whether Medical Emergency Prevents Compliance with Procedural Requirements

■ The plaintiffs' next vagueness challenge concerns the provision of the post-viability act that excuses physicians from complying with the five procedural requirements for performance of a post-viability abortion where the nature of the medical emergency prevents such compliance. The pertinent provision reads as follows: "Except in the case of a medical emergency which, in the *reasonable medical judgment* of the physician performing the abortion, prevents compliance with a particular requirement of this subsection, no abortion which is authorized under subsection (b)(1) shall be performed unless each of the following conditions are met: . . . ." 1975 Ala.Code § 26–22–3(c) (Law.Co-op.Supp.1997) (emphasis added). Plainly, this provision, by use of the term "reasonable" to describe the medical judgment that must be employed, imposes a standard with an objective component on the physician's determination of whether compliance with one of the statute's procedural requirements is impossible due to the nature of the medical emergency. Additionally, examination of the statute reveals that liability for an erroneous determination under this provision is not subject to any scienter requirement. Thus, as the plaintiffs allege, the post-viability abortion statute imposes strict liability on a physician who forms an unreasonable medical judgment that a woman's medical condition prevents compliance with one or more of the five procedural requirements set forth in § 26–22–3(c)(1) through (5) of the act, and consequently fails to comply with those requirements.

■ Accordingly, the court must again decide whether the plaintiffs have stated a claim upon which relief may be granted that the objective component of the standard governing physicians' medical determinations, in the absence of a scienter requirement, renders the pertinent provisions unconstitutionally vague. In view of *Colautti*, and for all of the reasons stated above regarding the alleged vagueness of the provisions governing whether the post-viability abortion is medically necessary, the court finds that the plaintiffs have stated a claim concerning the provisions at issue here. Based upon the plaintiffs' allegations regarding the uncertainty inherent in physicians' judgments regarding the nature and implications of medical emergencies, the court concludes that the "perils of strict liability" discussed in *Colautti* are present here, where physicians exercising their good faith medical judgment regarding whether compliance with statutory requirements is prevented by a medical emergency could nonetheless be held liable if other physicians subsequently second-guess their determinations.

B. Alleged Undue Burden Imposed By the Partial–Birth Abortion Statute

■ Having addressed all of the vagueness challenges to the post-viability abortion

statute, the court must next ascertain whether the plaintiffs have stated a claim regarding the alleged undue burden imposed on pregnant women by the partial birth abortion statute. The undue-burden challenges are grounded primarily on the Supreme Court's decision in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 872–76, 112 S.Ct. 2791, 2817–20, 120 L.Ed.2d 674 (1992), in which a plurality of the Court abandoned the trimester-based analytic framework for determining the constitutionality of abortion regulations developed in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), in favor of one that requires courts to ascertain whether pre-viability abortion regulations impose an undue burden on the woman's right to make the ultimate decision whether to terminate her pregnancy. In somewhat more concrete terms, *Casey* forbids states from enacting pre-viability abortion regulations that have "the purpose and effect of placing a substantial obstacle in the path of a woman seeking an abortion." *See id.*, 505 U.S. at 877, 112 S.Ct. at 2820.

As alluded to above in the context of the plaintiffs' vagueness challenges, the court must resolve an important threshold issue prior to undertaking the undue-burden analysis. Specifically, the court must determine whether the standard governing this analysis is that articulated in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), under which the court may invalidate the statute only after concluding that it imposes an undue burden under *all possible circumstances*, or the standard that was actually employed in *Casey* itself, where the Supreme Court looked at whether "in *a large fraction* of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a women's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. at 2830 (emphasis added). Although at first blush it seems obvious that the court should apply the less-restrictive *Casey* formula, the answer is not so straightforward

because the *Casey* plurality did not explicitly acknowledge that it had abandoned the *Salerno* test in the pre-viability abortion context in favor of the less stringent standard it applied, and individual justices in post-*Casey* opinions have adopted inconsistent positions concerning this question, as have several lower courts. *See Voinovich*, 130 F.3d at 194–95 (citing conflicting post-*Casey* statements made by various Supreme Court justices regarding *Salerno's* continued vitality, and holding that the *Casey* standard applies to pre-viability abortion regulations after surveying the pertinent post-*Casey* lower court decisions and noting that the Third, Eighth, and Tenth Circuits, as well as two district courts, apply that standard, while only the Fifth Circuit applies the more stringent *Salerno* test). The Eleventh Circuit has not yet grappled with this issue, which appears to be one of first impression in this circuit.

This court agrees with the majority of courts that have addressed this question and concludes that challenges to the pre-viability application of the Alabama abortion statutes are governed by the *Casey* standard, rather than that set forth in *Salerno*.[36] In doing so, this court, like the Sixth and Eighth Circuits, has decided to "follow what the Supreme Court actually did—rather than what it failed to say—and apply the undue-burden test." *See Voinovich*, 130 F.3d at 195–96; *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456–58 (8th Cir.1995). Therefore, in determining whether the plaintiffs have stated a claim that the partial-birth abortion statute imposes an undue burden on women seeking pre-viability abortions, the court will ascertain whether the plaintiffs have alleged that "in a large fraction of cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. at 2830. Accordingly, as the Sixth Circuit stated in *Voinovich*, "Even if the Act has some constitutional applications, [the court] must strike it down if it is unconstitutional under *Casey*." 130 F.3d at 196.

The plaintiffs level two primary undue burden challenges against the act: (1) that to

---

**36.** This conclusion applies only to the plaintiffs' *pre*–viability challenges; whether the *Salerno* or *Casey* standard governs the plaintiffs' *post*-viability challenges to the Alabama abortion statutes is a separate question that is taken up below.

the extent the statute prohibits a woman from obtaining a pre-viability abortion altogether, because it forecloses her use of the most common and safest means available, it imposes an undue burden; and (2) that to the extent the statute forces a woman who chooses to terminate her pregnancy to use an alternative method to the one she prefers, with an attendant increase in risk to her health, it imposes an undue burden.

As other courts that have examined analogous partial-birth abortion statutes have observed, the Supreme Court has offered only limited guidance as to how the *Casey* standard is to be applied in the context of a ban on a specific abortion technique. *See Voinovich,* 130 F.3d at 200–01; *Evans v. Kelley,* 977 F.Supp. 1283, 1315–16 (E.D.Mich.1997). While no post-*Casey* Supreme Court decisions have addressed such a ban, the Court in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), did examine a statute that banned a specific abortion procedure, and thus this decision offers some guidance as to how this court should approach the plaintiffs' challenges to Alabama's partial-birth abortion statute.

In *Danforth,* the Court invalidated a Missouri statutory ban on the use of the saline amniocentesis abortion procedure after the first 12 weeks of pregnancy. Having found that saline amniocentesis was a very safe and prevalent procedure for post-first-trimester abortions, the Court concluded that the act, "as a practical matter ... forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed." 428 U.S. at 79, 96 S. Ct. at 2845. As a consequence, according to the Court, the act represented "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting the vast majority" of second trimester abortions, and thus could "not withstand constitutional challenge." *Id.*

Consistent with the approaches taken in both *Danforth* and *Casey,* this court, like the courts addressing partial-birth abortion bans in *Voinovich* and *Evans,* will determine whether the Alabama act imposes an undue burden by examining whether there are safer alternative procedures available in the state

than those alleged to be banned by the act. *See Voinovich,* 130 F.3d at 200–01 (finding that the challenged statute imposed an undue burden because it banned "the most common method of abortion in the second trimester"); *Evans,* 977 F.Supp. at 1315–19 (finding that the challenged statute imposed an undue burden by comparing the banned procedures to other available pre-viability abortion procedures). Thus, before the court may ascertain whether the plaintiffs have stated a claim that the partial-birth abortion statute imposes an undue burden and so is unconstitutional under *Casey,* it must first determine with precision the actual procedures that are subject to the act's proscription. In other words, the court cannot perform the requisite comparison of the relative safety of the banned techniques and any other available procedures without first understanding exactly which techniques are banned by the statute.

The court is not presently in a position to undertake this comparison because it has not yet determined which abortion procedures are banned by the partial-birth abortion statute. Instead, because the relevant provisions of the statute have not yet been construed by the Alabama courts, and the particular construction adopted by that court will undoubtedly affect the determination of the constitutional questions raised in the complaint, the court has opted to certify the question of which specific techniques are outlawed by the statute to the Alabama Supreme Court. Consequently, until that court has spoken, this court cannot determine whether the plaintiffs' undue burden challenges against the partial-birth abortion statute state a claim upon which relief may be granted. The court will therefore postpone ruling on this issue until the Alabama Supreme Court has responded to the certified questions, and the foregoing discussion is intended to provide the parties with guidance as to the analytical scheme the court will employ to adjudicate the plaintiffs' undue burden challenges to the partial-birth abortion statute.

C. Alleged Unconstitutionality of the Partial–Birth Abortion Statute Due to Lack of a Maternal Health Exception

The plaintiffs also challenge the constitutionality of the partial-birth abortion statute

to the extent it regulates *post* viability abortions. Specifically, the plaintiffs assert that the ban is unconstitutional because the sole emergency exception provision in the statute, § 26–23–4, relieves the physician of liability only where the partial-birth abortion is necessary to save the woman's life, and not for abortions deemed necessary to preserve maternal *health* more generally. In support of this argument, the plaintiffs point to the Court's statement in *Casey* that it "re-affirm[ed] *Roe*'s holding that subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion *except* where it is necessary, in appropriate medical judgment, for the preservation of the life or *health* of the mother." 505 U.S. at 879, 112 S.Ct. at 2821 (emphasis added). According to the plaintiffs, the Alabama statute is unconstitutional under this standard because it could impermissibly force a women to undergo a more dangerous and life-threatening procedure even where her physician concludes that an abortion procedure proscribed by the act is necessary to preserve her health; thus, it is only when the woman is actually dying, the plaintiffs contend, that she may have recourse to the proscribed procedures.

Despite the fact that this court has decided to certify to the Alabama Supreme Court questions pertaining to the definition of the precise procedures proscribed by the partial-birth abortion statute, it sees no reason to postpone its decision on whether this challenge presents a claim upon which relief may be granted. It seems clear that, regardless

of how the Alabama Supreme Court construes the statute, post-viability applications of certain abortion procedures will be banned. Thus, the question of whether the alleged absence of a maternal health exception renders the statute unconstitutional, to the extent that it proscribes post-viability abortions, will not be rendered moot, or be substantially altered, by the state court's answer to the certified questions.

i. Legal Standard for Facial Challenges to Post–Viability Abortion Regulations

Before it may consider whether this challenge to the partial-birth abortion statute, based upon its alleged lack of any maternal health exception, constitutes a claim upon which relief may be granted, the court must first revisit the question of whether the applicable standard for such a facial challenge to a statute is that articulated in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), which requires that the plaintiffs show that "no set of circumstances exist under which the [statute] would be valid," or the standard employed in *Casey*, under which the plaintiffs must demonstrate that the statute would be unconstitutional "in a large fraction of the cases in which [it] is relevant." [37] This determination is distinct from that undertaken previously by the court in relation to the plaintiffs' challenges to the *pre* viability regulation of abortions, because the Supreme Court had occasion to apply the less restrictive test in *Casey* only as to pre-viability enactments,

---

**37.** The determination of which standard governs the plaintiffs' challenge to the post-viability application of the partial-birth abortion statute is critical. Should the court find that *Salerno* applies, the plaintiffs would face an insurmountable barrier. Specifically, they could never establish that "no set of circumstances" exists under which the statute would be valid, because they could not demonstrate that all women seeking post-viability abortions would suffer a medical emergency that required them to undergo a partial-birth abortion to preserve their health. That is, the plaintiffs could not counter an argument that in the vast majority of cases in which women seek post-viability abortions, the statute would impose no burden whatsoever because all but a few such women would not face a medical emergency necessitating recourse to a partial-birth abortion procedure to preserve their health.

By contrast, the plaintiffs could possibly satisfy the more permissive *Casey* standard, by alleging facts sufficient to establish that "in a large fraction of the cases" in which women seek post-viability abortions, the absence of a maternal health exception in the partial-birth abortion statute would unconstitutionally deprive women of access to a technique that would better preserve their health than non-proscribed alternative procedures. *See Casey*, 505 U.S. at 894–95, 112 S.Ct. at 2829–30 (rejecting state's argument that the challenged abortion regulation imposed almost no burden at all on the vast majority of women seeking abortions, and stating that "the proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant").

and not those proscribing or regulating post-viability abortions.

The attorney general defendants contend that this question is not controversial, because in the area of post-viability regulations, "there is no post-*Casey* confusion as to the applicability of the *Salerno* ... standard."[38] The attorney general defendants therefore argue that under the governing *Salerno* standard the plaintiffs' claims contesting the constitutionality of the post-viability applicability of the partial-birth abortion statute should be dismissed because the plaintiffs have failed to allege that "no set of circumstances exist under which the Act would be valid" in the post-viability context. However, the attorney general defendants cite no post-*Casey* decisions to support their rather conclusory assertion that no confusion surrounds the post-viability applicability of the *Salerno* standard, and the court's investigation indicates that any absence of confusion stems solely from the fact that the instant dispute is only the second one in which courts have been confronted with this precise question. See *Voinovich*, 130 F.3d at 196. Moreover, as explained below, in *Voinovich*, the one other instance in which this question has been addressed, the Sixth Circuit concluded that the *Casey* "large fraction of cases" standard, and not that articulated in *Salerno*, governs facial challenges to post-viability regulations. See *id.*

In *Voinovich*, the Sixth Circuit recognized that *Casey* itself does not answer the question of which standard to apply in the post-viability context. *Id.* Nonetheless, the court affirmed the district court's holding that *Casey*'s standard should be extended to post-viability abortion regulations, because it could "see no reason to apply a different standard for pre and post-viability abortions." *Id.* The district court had provided the following explanation for its conclusion:

"After careful consideration of the interests involved, this Court concludes that the *Salerno* requirement that the plaintiff must show that 'no set of circumstances exists under which the law would be valid,' should not apply to facial challenges to post-viability abortion regulations which

may unconstitutionally threaten the life or health of even a few pregnant women. The Court so holds for three reasons. First, the cases which have applied *Salerno* have not involved laws which threaten to inflict, unconstitutionally, such severe and irreparable harm. Second, because the Supreme Court signalled in *Casey* that an unconstitutional infringement of the liberty interests of some, but not all, pregnant women, is sufficient to justify application of a lesser standard where a previability abortion is concerned, there is no reason why the Court would not similarly apply a lesser standard where a law threatens to deprive some, but not all, pregnant women of their greater constitutional interest in their own life and health. Finally, and most importantly, it would be unconscionable to hold that a pregnant woman—or her estate—may not challenge a post-viability regulation until after she is unconstitutionally deprived of her life or health. Therefore, this Court will allow Plaintiff to facially challenge this post-viability ban, even though he has not shown that 'no set of circumstances' exists under which the ban would be valid."

*Women's Medical Professional Corp. v. Voinovich*, 911 F.Supp. 1051, 1062 (S.D.Ohio 1995) (internal footnote omitted).

 Although this court largely agrees with this analysis, and reaches the same conclusion, further explanation is warranted. In determining whether the *Casey* standard should apply to post-viability regulations, the court must be sure to take into account the fact that the state has a "profound interest" in potential life, which may be promoted subsequent to viability by regulation, or even proscription, of abortion, except where necessary to preserve maternal life or health. See *Casey*, 505 U.S. at 878–79, 112 S.Ct. at 2821. As the *Casey* plurality stated, after viability has been reached, this interest in potential life has "sufficient force so that the right of the woman to terminate the pregnancy can be restricted." *Id.* at 869, 112 S.Ct. at 2816. In other words, post-viability, "the independent existence of the second life can in reason and all fairness be

---

**38.** Supplemental memorandum in support of defendants' motion to dismiss, filed on September 22, 1997 (Doc. no. 22), at 37 n. 21.

the object of state protection that now overrides the rights of the woman." *Id.* at 870, 112 S.Ct. at 2817. By contrast, in the pre-viability context, where the majority of courts have rejected the *Salerno* approach in favor of that of *Casey,* the woman's rights are not outweighed by those of the state. As a result, the state is limited to adopting "measures to ensure that a woman's choice is informed … as long as their purpose is to persuade the woman to choose childbirth over abortion [and they are not] an undue burden on the right [of the woman to obtain a pre-viability abortion]." *Id.*

Accordingly, the question of whether *Casey's* less-restrictive standard applies to post-viability abortion regulations must accord sufficient deference to the enhanced strength of the state's interest in protecting potential life at that stage of the pregnancy. Although neither the Sixth Circuit nor the district court in *Voinovich* explicitly discussed whether this interest of the state militates against extending the *Casey* pre-viability standard to the post-viability context, and thus one cannot determine whether these courts considered this crucial issue, this court concludes that the *Voinovich* district court's second and third rationales do provide a sufficient basis for adopting the *Casey* standard even in the face of the enhanced state interest in potential life.

The district court in *Voinovich* explained its second rationale for extending the *Casey* standard to post-viability regulations as follows: "[B]ecause the Supreme Court signalled in *Casey* that an unconstitutional infringement of the liberty interests of some, but not all, pregnant women, is sufficient to justify application of a lesser standard where a pre-viability abortion is concerned, there is no reason why the Court would not similarly apply a lesser standard where a law threatens to deprive some, but not all, pregnant women of their greater constitutional interest in their own life an health." *Voinovich,* 911 F.Supp. at 1062. Thus, the district court concluded that because pregnant women's constitutional interest in their own life and health is even stronger than the women's liberty interest in choosing to terminate a pregnancy, the Supreme Court would per-

ceive no difficulties in applying the permissive *Casey* standard to an arena where the former interest is implicated by a state's restrictions on post-viability abortions.

This court agrees that a woman's profound constitutional interest in her own life and health justifies extension of the *Casey* standard to the post-viability abortion arena, because this interest is sufficiently powerful to overcome the state's interest in potential life even after the viability threshold has been crossed. *See Casey,* 505 U.S. at 879, 112 S.Ct. at 2821 (recognizing women's interest in their own life and health by re-affirming that post-viability abortions may not be proscribed or regulated where they are necessary to preserve the life or health of the mother). Thus, this court, like the district court in *Voinovich,* sees no reason why the Supreme Court would not apply the *Casey* standard to facial challenges to post-viability abortion regulations.

This conclusion is bolstered by the third rationale provided by the *Voinovich* district court for its adoption of the *Casey* standard, that "it would be unconscionable to hold that a pregnant woman—or her estate—may not challenge a post-viability regulation until *after* she is unconstitutionally deprived of her life or health." 911 F.Supp. at 1063 (emphasis in original). This well-founded concern stems from the district court's recognition that the all-but-insurmountable *Salerno* standard would effectively close the courthouse doors to facial challenges to abortion statutes even where a plaintiff alleges that her life or health interests are jeopardized unconstitutionally, leaving no alternative aside from an "as applied" challenge brought after the plaintiff has suffered a constitutional injury under the challenged act. Of course, as the *Voinovich* district court appreciated, such lawsuits would come too late for women who have died or whose health has been irreparably damaged because a necessary abortion procedure was rendered off-limits by an unconstitutional state enactment.

Thus, for the foregoing reasons, the court will apply the *Casey* standard to adjudicate the plaintiffs' facial challenges to the post-viability application of the partial-birth abortion statute.[39] And thus, for purposes of the

---

**39.** For the reasons stated above, this standard will also be applied to the plaintiffs' challenges to

pending motion to dismiss, the court will permit the plaintiffs to mount a facial attack on the disputed post-viability regulations even if they cannot demonstrate that " 'no set of circumstances' exists under which the pertinent provisions would be constitutional. Instead, the plaintiffs must merely allege sufficient facts to indicate that these provisions would be unconstitutional in a large fraction of the cases in which [they are] relevant." *See Casey,* 505 U.S. at 895, 112 S.Ct. at 2830 (plurality opinion)

ii. Application of the Legal Standard to Plaintiffs' Challenges to the Post–Viability Application of the Partial–Birth Abortion Statute

As stated, the plaintiffs' challenge to the partial-birth abortion statute based upon its lack of any maternal health exception relies heavily upon the *Casey* Court's express reaffirmance of *Roe*'s holding that, "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion *except* where it is necessary, in appropriate medical judgment, for the preservation of the life or *health* of the mother." 505 U.S. at 879, 112 S.Ct. at 2821 (emphasis added). The plaintiffs further rely upon the Supreme Court's decision in *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 768–69, 106 S.Ct. 2169, 2183, 90 L.Ed.2d 779(1986), and a Tenth Circuit decision, *Jane L. v. Bangerter,* 61 F.3d 1493, 1504 (10th Cir.1995), *rev'd on other grounds sub nom. Leavitt v. Jane L.,* 518 U.S. 137, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996), *on remand,* 102 F.3d 1112 (10th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997), in support of this argument.

In *Thornburgh,* a pre-*Casey* decision, the Supreme Court invalidated a Pennsylvania statute that compelled physicians performing post-viability abortions to employ the technique that "would provide the best opportunity for the unborn child to be aborted alive,

unless, in the good faith judgment of the physician, that method or technique would present a *significantly greater medical risk* to the life or health of the pregnant woman than would another available method or technique and the physician reports the basis for his judgment." 476 U.S. at 768 n. 13, 106 S.Ct. at 2183 n. 13 (emphasis added). The Court expressly agreed with the Third Circuit's holding that this provision was unconstitutional "because it required a 'trade-off' between the woman's health and fetal survival, and failed to require that maternal health be the physician's paramount consideration." *Id.* at 768–69, 106 S.Ct. at 2183 (citing *Colautti,* 439 U.S. at 397–401, 99 S.Ct. at 686–689).

Similarly, the Tenth Circuit in *Jane L.* struck down as unconstitutional two sections of a Utah abortion statute that required physicians to perform post-viability abortions in a manner that would "give the unborn child the best chance of survival," unless such a method would cause "grave damage to the woman's medical health." 61 F.3d at 1502–05. The *Jane L.* court rejected the defendants' contention that the portions of *Thornburgh* discussed above were "uprooted by *Casey,*" and instead concluded that *Thornburgh* governed the determination of whether the provisions at issue were constitutionally infirm.[40] Noting that the Utah statute dictated that fetal survival must take precedence over maternal health absent a risk of "grave damage," the *Jane L.* court held that the statute violated the "consistent strain of abortion jurisprudence," running through the Supreme Court's decisions in *Roe, Thornburgh,* and *Casey,* requiring that "maternal health, not fetal survival, remains the physician's paramount consideration." *Jane L.,* 61 F.3d at 1504. As the Tenth Circuit further explained:

" 'Grave damage' is clearly a higher standard than the Court has articulated. According to *Casey, Thornburgh,* and *Roe,* concern for the 'preservation' of a woman's

the provisions of Alabama's post-viability abortion statute.

**40.** The Tenth Circuit stated, and this court agrees, that although *Casey* overruled the portions of *Thornburgh* that addressed the issue of

informed consent, the Supreme Court left intact *Thornburgh* to the extent that it relied upon *Roe's* approach to post-viability regulation of abortions, which was expressly re-affirmed in *Casey. See Jane L.,* 61 F.3d at 1504 & n. 9.

health suffices to elevate her liberty interests decisively above those of the state or the unborn child. By requiring a woman to suffer 'grave damage' to her health before her liberty interests predominate, the Utah legislature violated those portions of Roe and *Thornburgh* that *Casey* reaffirmed, and unconstitutionally devalued a woman's privacy rights."

*Id.*

█ Although this court recognizes that both *Thornburgh* and *Jane L.* addressed statutes that purported to ban post-viability abortions generally, except under particular circumstances, including when certain medical emergencies exist, while Alabama's partial-birth abortion statute bans the post-viability application of only a specified type of abortion procedure, the court concludes that the reasoning underlying *Thornburgh* and *Jane L.* applies with equal force here. All three abortion statutes (those in *Thornburgh, Jane L.,* and the partial-birth abortion statute at issue here) have the effect of limiting the woman's, and her doctor's, choice of an appropriate abortion method, creating the possibility that a preferred method may be proscribed except where there exists a medical emergency satisfying certain specific requirements. In fact, because the plaintiffs allege that the Alabama statute is devoid of any exception whatsoever to protect maternal health, while the two state enactments addressed in *Thornburgh* and *Jane L.* did at least contain some form of health exception, rather than just an exception to protect the pregnant woman's life, the constitutional infirmity may be even more pronounced here than it was in *Thornburgh* and *Jane L.* Thus, in view of these decisions and the plaintiffs' allegations that the Alabama partial-birth abortion statute lacks any maternal health exception whatsoever, the court concludes that this challenge to the partial birth abortion statute presents a claim upon which relief may be granted.

**D. Alleged Unconstitutionality of the Partial–Birth Abortion Statute's Civil Liability Provisions**

In their final attack on the constitutionality of the partial-birth abortion statute, the plaintiffs challenge the civil-liability provisions of the act, which provide for tort claims against the physician performing the proscribed abortion. Either the "father" of the fetus, if married to the woman who underwent the abortion, or the "maternal grandparents" of the fetus, if the woman was a minor at the time, may bring such an action. No suit may be brought by the complainant if the complainant consented to the abortion, or if the complainant's criminal conduct caused the pregnancy.

The plaintiffs support their argument by reference to a number of Supreme Court decisions that have addressed the constitutionality of statutes providing for a spousal or parental "veto" of a woman's decision to terminate her pregnancy, as well as decisions that have examined similar "notification" provisions. The plaintiffs assert that the liability provisions in the Alabama act are tantamount to the types of spousal or parental consent and notification requirements that the Supreme Court has invalidated as creating an unconstitutional impediment to a woman's right to terminate her pregnancy, because although they do not expressly require that the woman or her physician obtain the consent of the husband or parents, only by seeking such consent may the physician evade liability under the statute. The plaintiffs further support this argument by bringing to the court's attention a recent decision, *Planned Parenthood of Southern Arizona, Inc. v. Woods,* 982 F.Supp. 1369, 1379–1380 (D.Ariz.1997), in which the district court held unconstitutional an Arizona partial-birth abortion statute containing a civil liability provision analogous to that in the Alabama enactment because, among other reasons, it found that there is no practical difference between such a provision and one that mandates spousal or parental consent.[41]

41. The pertinent provision of the Arizona act reads as follows:
"The father of the fetus if married to the mother at the time she receives a partial-birth abortion and the maternal grandparents of the fetus if the mother is not at least eighteen years of age at the time of the partial-birth abortion may bring a civil action to obtain appropriate

relief unless the pregnancy resulted from the plaintiff's criminal conduct or the plaintiff consented to the partial-birth abortion. Relief pursuant to this subsection includes the following:
1. Monetary damages for all injuries resulting from the partial-birth abortion, including psychological and physical damages.

The attorney general defendants urge the court to dismiss this claim on two grounds. First, they assert that the plaintiffs cannot bring the claim under the fourteenth amendment because, in the context of civil lawsuits for damages, the requisite "state action" does not exist until an enforceable judgment against the plaintiffs has been entered. Second, the attorney general defendants contend that the civil-liability provisions further rational state interests and do not sufficiently interfere with women's right to a pre-viability abortion to constitute an undue burden under *Casey.* To support this latter point, the attorney general defendants direct the court's attention to *Midtown Hosp. v. Miller,* No. 1:97–CV–1786–JOF, slip. op. at 13–16 (N.D.Ga. July 24, 1997), in which the district court upheld a Georgia partial-birth abortion statute containing a civil-liability provision whose language tracks that of the Alabama and Arizona statutes.

■■■ The court rejects both of these arguments, and concludes that the plaintiffs' challenge to the civil liability provision of the partial-birth abortion statute presents a claim upon which relief may be granted. Regarding the attorney general defendants' contention that the plaintiffs cannot attack the constitutionality of the civil liability provisions under the fourteenth amendment absent an enforceable judgment entered by a state court, the court agrees, of course, that there must be "state action" in order for the plaintiffs to raise a claim of violation of the fourteenth amendment's due process clause. *See, e.g., Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). However, the court rejects the attorney general defendants' assertion that state action does not exist here absent a civil judgment against the plaintiffs entered by a state court. Instead, the court concludes that the requisite state action has been alleged by the plaintiffs, when they assert that the civil liability provisions are, in practical terms, akin to statutory requirements that women seek the consent of their parents or spouses before obtaining abortions. In other words, the plaintiffs allege that these provisions, far

from functioning merely as neutral statutes that facilitate civil suits between private parties, represent a conscious effort by the state to make it more difficult for women to obtain desired abortions by requiring the women, or their physicians, to first secure their parents or spouses' consent. These allegations of purposeful, albeit somewhat circuitous, state regulation of women's conduct are sufficient to support a conclusion that the requisite state action exists with regard to the challenged civil liability provisions.

This conclusion is reinforced by the additional fact that the plaintiffs here allege that the *enactment* of the allegedly unconstitutional partial-birth abortion statute caused them injury by threatening them with potential criminal and civil liability if they continue their professional—and allegedly constitutionally-protected—activities. Thus, here the plaintiffs contend that state action sufficient to permit their claims occurred during the enactment of the challenged statute by the state legislature and the governor, and the plaintiffs need not depend upon any actual or potential private enforcement of the statutes by litigants bringing civil actions. *See Denver Area Educational Telecommunications Consortium Inc. v. F.C.C.,* 518 U.S. 727, ——, 116 S.Ct. 2374, 2404, 135 L.Ed.2d 888 (1996) (Kennedy, J., concurring in part and dissenting in part) (agreeing with plurality opinion's holding that the enactment of the challenged statute constituted state action, and noting that "state action lies in the enactment of a statute altering legal relations between persons, including the selective withdrawal from one group of legal protections against private acts, regardless of whether the private acts are attributable to the State"); *Paul v. Watchtower Bible & Tract Soc'y,* 819 F.2d 875, 880 (9th Cir.1987) ("State laws whether statutory or common law ... constitute state action."). Consistent with this fact, the plaintiffs have named as a defendant in this action Alabama's governor, one of the state actors responsible for the enactment of the statute. Accordingly, the court finds that the plaintiffs may pursue their challenge to the civil liability provisions of the two abortion statutes pursuant to the fourteenth amendment.[42]

---

2. Damages in an amount equal to three times the cost of the partial-birth abortion." Ariz.Rev.Stat. Ann. § 13–3603.01(C).

**42.** The court acknowledges that other courts have held, under certain circumstances, that the mere enactment of a statute, without fur-

■ The court also rejects the attorney general defendants' second contention, that the civil liability provisions do not impose an undue burden because they further rational state interests and operate only in a limited set of circumstances. As stated, the plaintiffs allege that the civil liability provisions are tantamount to statutory requirements that women seek the consent of their parents or spouses before obtaining abortions. These allegations are sufficient to support a claim upon which relief may be granted. See *Planned Parenthood of Southern Ariz. v. Woods*, 982 F.Supp. 1369, 1379–1380 (D.Ariz.1997) (holding that analogous civil liability provisions are unconstitutional because they are akin to spousal and parental consent provisions). The Supreme Court has found that abortion statutes requiring notification of husbands can "prevent a significant number of women from obtaining an abortion," and thus impose an undue burden on their right to abortion. *See Casey*, 505 U.S. at 893–94, 112 S.Ct. at 2829 (further noting that, in view of the myriad legitimate fears women have about informing their husbands that they intend to seek an abortion, a spousal notification provision "does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle"). Additionally, the Supreme Court has consistently required that statutes mandating parental consent must provide for a judicial bypass procedure. *Id.* at 899, 112 S.Ct. at 2832; *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 510–19, 110 S.Ct. 2972, 2978–83, 111 L.Ed.2d 405 (1990); *Bellotti v. Baird*, 443 U.S. 622, 643–44, 99 S.Ct. 3035, 3048, 61 L.Ed.2d 797 (1979) (plurality opinion). The partial-birth abortion statute provides for no such bypass procedure. Thus, the court declines to conclude, as the attorney general defendants urge, that the civil liability provision does not, as a matter of law, impose an undue burden on women seeking abortions. Accordingly, the court will not dismiss this challenge to the partial-birth abortion statute as failing to state a claim upon which relief may be granted.

E. Alleged Unconstitutionality of the Post–Viability Abortion Statute Due to "Trade–Off" between Woman's Health and Fetal Survival

In their final challenges, leveled against the post–viability abortion statute, the plaintiffs assert that the procedural requirements imposed by the statute on physicians performing post-viability abortions constitute an impermissible "trade-off" between the health of the pregnant woman and the fetus' survival. Specifically, the plaintiffs target the following requirements in the statute: (1) the requirement in § 26–22–3(c)(2) that the phy-

---

ther involvement of state actors in the allegedly unconstitutional conduct, may not provide the requisite state action for purposes of an action under the fourteenth amendment. *See Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988) (noting that the enactment of "self-executing" statutes of limitations addressed in previous decisions was obviously state action, but that "the State's limited involvement in the running of the time period generally falls short of constituting the type of state action required to implicate the protections of the Due Process Clause."); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (holding that the sale by a storage company of an individual's property to enforce a lien on that property, pursuant to a provision of the New York Uniform Commercial Code, did not constitute "state action" for fourteenth amendment purposes.) In *Flagg Bros.*, the Court expressly rejected the plaintiffs' claim that the proposed sale of their property by the defendant storage company was attributable to the state because it had "authorized and encour-

aged" such action by enacting the applicable provision. *Id.* at 164–66, 98 S.Ct. at 1737–38.

Significantly, however, *Flagg Bros.* concerned an attempt to sue a *non*-state-actor defendant on the basis of its exploitation of the challenged statutes, and did not involve a claim, such as that raised here, brought against a state actor responsible for the enactment of the challenged statute based upon allegations that the very enactment of the statute threatened to chill the plaintiffs' exercise of constitutionally-protected rights. In fact, the Court in *Flagg Bros.* did not specifically address the state action implications of enactment of the statute, but rather determined that private parties acting pursuant to the statute were not state actors because the statute had not delegated to the private parties functions exclusively reserved to the state. 436 U.S. at 157–64, 98 S.Ct. at 1733–37. Furthermore, in *Flagg Bros.* the plaintiffs made no contention, as is made here, that the challenged statute was tantamount to a direct effort by the state to regulate allegedly constitutionally-protected conduct. Thus, the holding in *Flagg Bros.* is inapposite here.

sician obtain the concurrence of a second physician regarding the necessity for the post-viability abortion; (2) the requirement in § 26–22–3(c)(3) that the abortion be performed in a hospital; (3) the requirement in § 26–22–3(c)(4) that the physician use the abortion technique that "provides the best opportunity for the unborn child to survive," except where this method would pose "a significantly greater risk of the death of the pregnant woman or substantial and irreversible impairment of a major bodily function of the woman than would other available methods"; and (4) the requirement in § 26–22–3(c)(5) that the physician arrange for the attendance, in the same room in which the abortion is to be completed, of a second physician who is charged with caring for the aborted child.

■■■ Before considering whether these challenges present claims upon which relief may be granted, the court first notes that each of the disputed requirements is subject to the medical emergency exception discussed in detail above, which provides that the physician need not satisfy the requirement "in the case of a medical emergency which, in the reasonable medical judgment of the physician performing the abortion, prevents compliance. . . ." 1975 Ala.Code § 26–22–3(c) (Law.Co-op.Supp.1997). As previously explained, the court has concluded that the plaintiffs have stated a claim that this emergency exception is unconstitutional because they allege that it imposes an objective standard of conduct without a curing scienter requirement. If the plaintiffs prevail on this claim, all of the challenged procedural requirements would fall as well, because they would no longer be subject to an exception, as required under the pertinent Supreme Court case law, for the preservation of the life or health of the mother. See Casey, 505 U.S. at 879, 112 S.Ct. at 2821 (re-affirming Roe's holding that the state may regulate post-viability abortions "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother."); cf. Voinovich, 130 F.3d at 206 (noting that because it had invalidated the medical emergency and necessity provisions of a post–viability abortion act, the court did not need to reach the constitutionality of the remaining post-viability regula-

tions). Therefore, because the court will reach the merits of the plaintiffs' challenges to the procedural requirements of the post-viability abortion statute only if it upholds the constitutionality of the medical emergency exception, the court will assume for the sake of determining whether these challenges present a claim upon which relief may be granted that the exception is constitutional, and thus operates to relieve the physician of responsibility for complying with any of the requirements where a medical emergency prevents such compliance.

The attorney general defendants' contention is wellfounded that all of the challenged requirements were included in the act to further the state's interest in the potential life of the fetus. This interest, as stated, is a "profound" one that may override the liberty rights of women seeking post–viability abortions. See Casey, 505 U.S. at 870, 112 S.Ct. at 2817; see also Planned Parenthood v. Ashcroft, 462 U.S. 476, 482–86, 103 S.Ct. 2517, 2520–22, 76 L.Ed.2d 733 (1983) (reaffirming Roe's holding that the state's interest in potential life is compelling, and upholding certain regulations of physician conduct during post-viability abortions because they "reasonably further" that compelling interest of the state). Thus, in determining whether the plaintiffs' challenges to the post–viability abortion statute should be dismissed, the court must ascertain whether the plaintiffs have alleged that the disputed statutory requirements do not "reasonably further" the state's compelling interest in potential life.

While the plaintiffs do not contest the applicability of this standard to their "trade-off" challenges, they rely upon the Supreme Court's holding in Thornburgh to urge the court to reject the attorney general defendants' contention that these claims should be dismissed. Specifically, the plaintiffs point to the holding in Thornburgh that abortion statutes must not create "an impermissible 'trade-off' between the woman's health and fetal survival," and thus fail to "require that maternal health be the physician's paramount consideration." 476 U.S. at 768–69, 106 S.Ct. at 2183. Each of the challenged requirements in the post-viability abortion statute, the plaintiffs contend, violates this

constitutional standard, and must therefore be invalidated.

The plaintiffs make their point most persuasively with respect to § 26–22–3(c)(4) of the statute, which, as noted above, requires that the physician use the abortion technique that "provides the best opportunity for the unborn child to survive," except where this method would pose "a significantly greater risk of the death of the pregnant woman or substantial and irreversible impairment of a major bodily function of the woman than would other available methods." Such a provision is known as a "choice-of-method" provision, because it restricts the woman's, and her doctor's, ability to choose the exact post-viability abortion method to be employed. *See Jane L.,* 61 F.3d at 1502–03. The plaintiffs maintain that the choice-of-method provision in the Alabama act is unconstitutional because it permits safer alternative techniques to be used only when the method that maximizes the fetus's chances for survival poses a "significantly greater risk" than the safer techniques, and not when, as is medically prudent, the statutorily-mandated technique is merely more risky than the alternative techniques. This restriction on the choice of abortion method, according to the plaintiffs, contravenes the pertinent Supreme Court standard because it favors fetal survival over maternal health and fails to ensure that the latter will remain the physician's paramount concern during the abortion procedure.

█ The court concludes that these allegations are sufficient to present a claim upon which relief may be granted. As discussed above, the notion of an impermissible "trade-off" between maternal health and fetal survival, as applied to choice-of-method provisions, first emerged in *Thornburgh.* The provision invalidated in that case required that physicians performing post-viability abortions employ the technique "which would provide the best opportunity for the unborn child to be aborted alive unless … that method or technique would present *a significantly greater medical risk* to the life or health of the pregnant woman than would another available method or technique…." 476 U.S. at 768 n. 13, 106 S.Ct. at 2182 n. 13 (emphasis added). Thus, this choice-of-method provision, like that found in the Alabama

post-viability abortion statute, employed a significantly greater risk standard. Consequently, the *Thornburgh* Court's holding that the statutory language "is not susceptible to a construction that does not require the mother to bear an increased medical risk in order to save her viable fetus" enjoys equal weight here, as does the Court's conclusion that the provision therefore is unconstitutional. In view of this fact, the court concludes that the plaintiffs have stated a claim upon which relief may be granted.

This conclusion withstands the court's assumption, stated above, that the emergency exception to the choice-of-method requirement is found constitutional and thus circumscribes the operation of this provision. Pursuant to that emergency exception, the physician would only be relieved of the responsibility for using the less safe, but statutorily-mandated, procedure where the medical emergency is such that that procedure would "create a serious risk of substantial and irreversible impairment of a major bodily function." *See* 1975 Ala.Code. § 26–22–2(6) (Law.Co-op.Supp.1997) (definition of "medical emergency"). Because this "serious risk" standard is also susceptible to attack, in view of *Thornburgh,* as too restrictive and thus as imposing an impermissible trade-off between maternal health and fetal survival, the court stands by its conclusion that the plaintiffs have indeed stated a claim that the choice-of-method provision contravenes Supreme Court precedent concerning post-viability abortion regulations.

As far as the plaintiffs' allegations regarding the remaining procedural requirements of the post-viability abortion statute are concerned, the attorney general defendants argue that the Supreme Court's decision in *Planned Parenthood Ass'n of Kansas City, Mo. v. Ashcroft,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), compels a conclusion that the challenged provisions are constitutional because they reasonably further the state's compelling interest in potential life. In *Ashcroft,* the Court upheld a Missouri statutory provision that required the presence of a second physician at the abortion of a viable fetus and that the second physician "take all reasonable steps in keeping with

good medical practice ... to preserve the life and health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman." 462 U.S. at 483, 103 S.Ct. at 2521. The Court disagreed with the lower courts' rulings that this provision was unconstitutional, and instead held that it reasonably furthered the state's compelling interest in protecting the lives of viable fetuses. In doing so, the Court rejected the argument that a second-physician requirement "distorts the traditional doctor-patient relationship, and is both impractical and costly." *Id.* at 483–484, 103 S.Ct. at 2521–22.

■ The attorney general defendants' reliance on *Ashcroft* is most clearly pertinent to the plaintiffs' challenge to § 26–22–3(c)(5) of Alabama's post-viability abortion statute, which mandates that a second physician be present at the abortion and care for the aborted child.[43] Importantly, however, the Alabama and Missouri provisions differ in the standards that govern the circumstances under which compliance with the second-physician-attendance requirement is waived. Under the Missouri statute, physicians need not comply with the requirement if the steps taken by the second physician merely "pose an increased risk" to the woman's life or health, while the analogous requirement in the Alabama act is waived only if compliance would "create a serious risk of substantial and irreversible impairment of a major bodily function."[44] Plainly, the Alabama act imposes a more restrictive standard on physicians, for even if the second physician's efforts to care for the aborted child do create an increased risk to the mother's health, those efforts must be undertaken, unless the risk rises to a level of "serious risk of substantial and irreversible impairment of a major bodily function" of the woman.

In light of this distinction between the two abortion statutes, and the previously-discussed requirement that post-viability regulations not impose an impermissible trade-off between maternal health and fetal survival, the court concludes that the plaintiffs' challenge to the second-physician-attendance provision in the Alabama post-viability abortion statute survives the attorney general defendants' motion to dismiss.

Regarding the plaintiffs' allegations concerning the remaining requirements of the post-viability abortion statute, that a second physician concur in the necessity for the abortion, and that it be performed in a hospital, the court is aware of no instances in which the Supreme Court has addressed

---

**43.** Although the plaintiffs do not describe the precise nature of this challenge to the second-physician-attendance requirement, it appears that they may be pursuing one or both of two separate theories: (1) that the requirement creates an impermissible trade-off between maternal health and fetal survival by mandating that the second physician take steps to save the aborted child even if such efforts increase the risk to the mother; and (2) that the requirement creates such a trade-off because it imposes time delays, increased expenses, or other factors adverse to the mother's health. The court finds that the plaintiffs have stated a claim on the basis of the first of these theories, as explained below in the main text of this memorandum opinion.

Moreover, the court finds that the second theory also supports a claim upon which relief may be granted. As explained more fully below in the context of the plaintiffs' challenges to the second-physician-concurrence and hospitalization requirements in the statute, the Supreme Court's decision in *City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 434–39, 103 S.Ct. 2481, 2495–97, 76 L.Ed.2d 687 (1983), can be read in conjunction with *Thornburgh* to establish that an impermissible trade-off between ma-

ternal health and fetal survival results when a statute imposes delays upon a woman in medical need of a post-viability abortion, and thereby increases the risk of the procedure. Thus, the plaintiffs can prevail on this claim if they demonstrate that compliance with the second-physician-attendance requirement could result in an increased risk to the pregnant woman due to delays associated with securing the attendance of the second physician. Under such circumstances, the physician may be unable to ensure that the pregnant woman's health remain his paramount consideration, as required by *Thornburgh,* if he deems an immediate abortion to be less risky to the woman than one performed at a later time with the second physician present. Accordingly, in light of these considerations and the plaintiffs' allegations regarding the increase in risk associated with delays in obtaining medically-necessary abortions, the court concludes that the claim based upon this theory survives the attorney general defendants' motion to dismiss.

**44.** Again, as explained above, the court assumes for the sake of addressing the plaintiffs' challenge to this requirement that the emergency exception is constitutional.

these types of provisions specifically in the context of *post*–viability abortions.[45] Rather, the Court has struck down second-physician-concurrence and hospitalization provisions that were directed generally to both pre and post-viability abortions under the *Roe* trimester-based analytic framework. *See City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 434–39, 103 S.Ct. 2481, 2495–97, 76 L.Ed.2d 687 (1983) (striking hospitalization provision governing all second-trimester abortions); *Ashcroft,* 462 U.S. at 481–82, 103 S.Ct. at 2520 (same); *Doe v. Bolton,* 410 U.S. 179, 199, 93 S.Ct. 739, 751, 35 L.Ed.2d 201 (1973) (striking second-physician-concurrence provision applying to all abortions). The Supreme Court's holdings in these cases, therefore, are not dispositive of the instant dispute, because the standard applied by the Court did not take into account the state's strong post-viability interest in preserving potential life. Nonetheless, the Court's discussion of the pitfalls of hospitalization and second physician-concurrence provisions in the foregoing decisions is relevant to this court's determination of the constitutionality of the analogous provisions of Alabama's post-viability abortion statute.

As far as hospitalization requirements are concerned, the Supreme Court in *Akron* invalidated the one at issue in that case because, among other reasons, it found that the requirement that all second-trimester abortions be performed in hospitals, as opposed to outpatient clinics, imposed a substantial financial burden, and, in cases where travel would be required, additional health risks on a woman seeking an abortion.[46] *Akron,* 462

U.S. at 434–35, 103 S.Ct. at 2495. The Court based these findings on data indicating that hospital-based abortions could cost more than twice as much as those performed in clinics, and evidence that few hospitals performed second-trimester abortions, increasing the likelihood that women would have to travel to find available facilities. *Id.*

The plaintiffs' allegations regarding the hospitalization requirement in the Alabama act echo the concerns of the Supreme Court in *Akron.* For instance, the plaintiffs allege that there is a shortage of hospitals that provide post-viability abortion services in Alabama, rendering compliance with this provision impossible or prohibitively expensive in certain circumstances, effectively denying some women any opportunity to obtain a desired—and sometimes medically necessary—post-viability abortion.

█ The court recognizes that the foregoing concerns expressed by the Supreme Court and the plaintiffs regarding the hospitalization requirements, to the extent that they do not focus on whether the requirements interfere with physicians' medical judgment regarding the necessity for a post-viability abortion, or whether they force an impermissible trade-off between women's health and fetal survival, are not relevant to the *post*-viability analysis undertaken here. Rather, insofar as these concerns focus on the obstacles erected by the hospitalization requirements to women seeking abortions, they are relevant to the undue burden analysis that is appropriate only in the context of *pre*-viability regulations. Despite this fact,

---

**45.** The district court in *Voinovich* did assess the constitutionality of a second physician concurrence provision in the post-viability context. *See* 911 F.Supp. at 1087–88. The court held that the plaintiff had demonstrated a substantial likelihood of success of establishing that the provision was unconstitutional, in view of the Supreme Court's decision in *Doe v. Bolton,* 410 U.S. 179, 199, 93 S.Ct. 739, 751, 35 L.Ed.2d 201 (1973). In *Bolton,* however, as explained below, the Court did not specifically address *post*-viability abortion regulations, but instead applied the *Roe* analytic scheme to regulations that governed all second-trimester abortions. Thus, this court is not convinced, as was the *Voinovich* district court, that the *Bolton* holding is dispositive in the post-viability realm.

Moreover, the Sixth Circuit, in affirming the district court's holding in *Voinovich,* did not

reach this issue because it had already invalidated the entire post-viability abortion ban and regulations on the basis of infirmities in the medical necessity and emergency exceptions. *See Voinovich,* 130 F.3d at 206.

**46.** The *Akron* Court also found that the hospitalization requirement did not further the state's legitimate interest in preserving and protecting maternal health because advances in medical technology had made certain outpatient clinic abortions as safe as those performed in hospitals. *Id.,* 462 U.S. at 437, 103 S.Ct. at 2496. This rationale, however, is at most remotely relevant to the Alabama statute at issue here, because it is the state's stronger interest in potential life that the hospitalization provision is designed to promote, according to the attorney general defendants.

the court nonetheless concludes that the plaintiffs have stated a claim that the hospitalization provision is unconstitutional. The precise basis for this conclusion bears further discussion.

As stated, one of the Supreme Court's grounds for invalidating the hospitalization requirement in *Akron* was that it would require women who sought post-viability abortions to travel to find facilities that would perform such abortions, and therefore to face any attendant health risks due to the resulting delay. This scenario, according to the plaintiffs' allegations, could also arise as a result of hospitalization requirement in Alabama's post-viability abortion statute. If the plaintiffs demonstrate that this scenario is indeed a real possibility, they could prevail on their claim that the provision is unconstitutional because it imposes an impermissible trade-off between women's health and fetal survival, in violation of the *Thornburgh* standard. The reason for this is as follows: a woman who is in medical need of a post-viability abortion, and faces an increased risk to her health or life if the abortion is delayed due to travel, will nonetheless be compelled to travel to a hospital and incur the additional risk in order to have the abortion legally performed. The sole escape hatch would open only if a medical emergency arose, such that the woman faced death or a "serious risk of substantial and irreversible impairment" of her health.[47] This would indeed constitute a trade-off between maternal health and fetal survival, and would, in those cases where the physician deems an immediate abortion in an outpatient clinic to be less risky to the pregnant woman than one performed in a hospital at a later date, impede the physician's ability to ensure that maternal health remain his paramount consideration. Accordingly, the court concludes that this claim survives the attorney general defendants' motion to dismiss.

Regarding the final challenged procedural requirement, that the physician obtain the concurrence of a second physician in the necessity for the abortion, the court reiterates that in *Bolton*, the Supreme Court struck down a somewhat analogous statutory requirement that physicians performing abortions obtain the concurrence of two additional doctors that the abortion is medically necessary. *See* 410 U.S. at 198–200, 93 S.Ct. at 750–751. Noting that the defendants had cited no other voluntary medical procedure subjected by the state to such a two-physician concurrence provision, the Court faulted this requirement as lacking any rational connection to the patient's needs and as unduly infringing on the physician's right to practice. *Id.* at 199, 93 S.Ct. at 751.

Importantly, as noted above, the abortion statute struck down in *Bolton* regulated pre-viability, as well as post-viability, abortions, and so the Court did not account for the state's strong post-viability interest in potential life when it invalidated the two-doctor concurrence requirement. By contrast, this court must evaluate the Alabama post-viability abortion statute in relation to the state's compelling interest, and so will uphold this provision so long as it reasonably furthers' that interest, *see Ashcroft*, 462 U.S. at 487, 103 S.Ct. at 2523, unless the plaintiffs can show that it impedes the attending physician's ability to ensure that maternal health remains his paramount consideration.

■■■ In view of the *Bolton* Court's misgivings about requiring doctors to obtain concurring opinions concerning the necessity of performing an abortion, this court is unwilling to conclude, as a matter of law, that the Alabama statute's second physician concurrence provision *reasonably* furthers the state's interest in potential life without impermissibly undermining the attending physician's ability to devote his primary attention to safeguarding the pregnant women's health. If the plaintiffs can establish that this provision unduly increases the medical risks faced by women who require post-viability abortions by, for instance, imposing substantial delays on the process or discouraging certain physicians from performing such abortions, they may prevail on the merits of this challenge at trial.[48] Accordingly,

---

**47.** Once again, as explained more fully above, the court assumes for the sake of addressing the plaintiffs' claim that the medical exception provision passes constitutional muster.

**48.** Needless to say, the court takes no position concerning whether facts such as these would actually permit the plaintiffs to prevail on this issue on the merits. Rather, these examples are offered purely to explain the court's conclusion

the court finds that the plaintiffs have stated a claim regarding the alleged unconstitutionality of the Alabama post-viability abortion statute's second-physician-concurrence requirement.

## VI. CONCLUSION

For the foregoing reasons, the court will deny the motion to dismiss filed by the governor. The court will grant the attorney general defendants' motion to dismiss to the following extent: (a) as to all of the plaintiffs' claims to the extent that the plaintiffs seek issuance of an injunction against the operation and enforcement of the challenged Alabama abortion statutes (Complaint ¶¶ 81 through 84); and (b) as to the plaintiffs' claim that the post-viability statute is unconstitutionally vague with respect to how physicians are to determine whether a fetus is viable (Complaint ¶¶ 75 & 76).

The court will deny the attorney general defendants' motion to dismiss to the extent the plaintiffs allege the following: (a) that the post-viability statute is unconstitutionally vague as to how physicians are to determine whether an abortion is necessary to prevent the death of the woman or the substantial and irreversible impairment of her health (Complaint ¶¶ 75 & 76); (b) that the post-viability statute is unconstitutionally vague as to how physicians are to determine whether a medical emergency prevents compliance with the statute's procedural requirements for conducting and documenting the abortion (Complaint ¶¶ 77 & 78); (c) that the partial-birth abortion statute is unconstitutional even if limited to post-viability abortions because it lacks any exception for preserving maternal health (Complaint ¶¶ 69 & 70); (d) that the partial birth abortion statute is unconstitutional because its civil liability provisions impose an undue burden on women seeking pre-viability abortions (Complaint ¶¶ 71 through 74); and (e) that the post-viability statute is unconstitutional because it impermissibly forces a "trade-off" between the woman's health and fetal survival, and fails to ensure that maternal health remain the physician's paramount concern (Complaint ¶¶ 77 & 78).

that this challenge survives the attorney general

In addition, the court will certify the following questions to the Supreme Court of Alabama pursuant to Rule 18 of the Alabama Rules of Appellate Procedure: (a) What is the meaning of "living fetus" as that term is used in the definition of "partial-birth abortion" provided in § 26–23–2(3) of the partial-birth abortion statute? (b) What specific abortion procedures constitute "partial-birth abortions" as that term is defined in § 26–23–2(3) of the partial-birth abortion statute and so are banned in § 26–23–3 of the statute? More specifically, which, if any, of the abortion techniques set forth in ¶¶ 36 through 41 of the plaintiffs' complaint, namely traditional dilation and evacuation, intact dilation and evacuation, saline induction, urea induction, prostaglandin induction, hysterotomy and hysterectomy, are proscribed by the statute because they constitute "partial-birth abortions"? (c) In "viability testing" under § 26–22–4 of the post-viability statute does fetal age, for purposes of determining whether a woman is past "her first 19 weeks of pregnancy," commence with fertilization or the first day of the woman's last menstrual period?

Finally, the court will deny the attorney general defendants' motion to dismiss to the extent the plaintiffs allege the following claims, but with leave to renew the motion to dismiss if appropriate after the Alabama Supreme Court has answered the certified questions: (a) that the partial-birth abortion statute is unconstitutionally vague as to which types of abortion procedures it proscribes (Complaint ¶¶ 63–64); (b) that the partial-birth abortion statute is unconstitutionally vague as to what is meant by a "living fetus" (Complaint ¶¶ 63–64); (c) that the post-viability statute is unconstitutionally vague as to when fetal age, for purposes of determining whether a woman is past "her first 19 weeks of pregnancy," commences; and (d) that the partial-birth abortion statute unconstitutionally imposes an undue burden on women seeking pre-viability abortions, to the extent that it prohibits the most common and safest abortion procedures, and to the extent that it imposes a substantial obstacle

defendants' motion to dismiss.

on women's choice of abortion method (Complaint ¶¶ 67 & 68).

An appropriate order will be entered.